# United States Court of Appeals
## For the First Circuit

---

Nos.  14-1528
      14-1548
      14-1906
      15-1878
      15-2277

UNITED STATES OF AMERICA,

Appellee,

v.

ENRICO PONZO,
a/k/a Henry Ponzo, a/k/a Michael P. Petrillo, a/k/a Rico, a/k/a
Joey, a/k/a Jeffrey John Shaw, a/k/a Jay Shaw,

Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Thompson and Barron, Circuit Judges,
and McConnell, District Judge.*

---

Allison J. Koury for appellant.
William A. Glaser, Attorney, Appellate Section, Criminal
Division, United States Department of Justice, with whom Leslie R.
Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy

---

* Of the District of Rhode Island, sitting by designation.

Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Michael L. Tabak, Assistant United States Attorney, Karen D. Beausey, Assistant United States Attorney, and Dustin M. Chao, Assistant United States Attorney, were on brief, for appellee.

---

April 7, 2017

---

**THOMPSON, Circuit Judge**.  Enrico Ponzo operated as a member of the northeast crime syndicate known as the Patriarca Family of La Cosa Nostra ("LCN").  After being charged with multiple criminal offenses, he absconded to Arizona (and later to Idaho), changed his identity, and joined a marijuana-shipping conspiracy.  A jury later convicted him on a bevy of charges, including conspiracy to commit racketeering, conspiracy to commit murder in aid of racketeering, conspiracy to distribute cocaine, extortion, flight from justice, and conspiracy to distribute marijuana.  And in this appeal, he complains of an assortment of supposed errors -- ranging from the prosecution's use of the grand jury to the court's sentence selection, and almost everything in between -- but none persuades.  Before explaining why that is, we briefly state the background facts, reserving additional detail for inclusion in our discussion of the relevant issues.

## BACKGROUND[1]

This case centers on Ponzo's affiliation with LCN, a crime network with a "boss," "soldiers," and "associates" -- an affiliation that began in the late 1980s and ended in the mid 1990s, give or take.  LCN operated its organized crime network

---

[1] Because Ponzo challenges the sufficiency of the evidence, we recite the facts in the light most favorable to the government. See United States v. Munyenyezi, 781 F.3d 532, 534 n.1 (1st Cir. 2015).

through trafficking drugs, loansharking, extortion, and illegal gambling. Ponzo's LCN membership formed the basis for the Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy for which he was convicted. Following his activities with LCN, Ponzo fled Massachusetts with multiple criminal charges pending and established himself in a marijuana-shipping business in Arizona. Later, he met his then-girlfriend and left Arizona and the marijuana business. And he eventually settled down in Idaho as a cattle rancher.

We begin with LCN. As a member of LCN, Ponzo's duties included "collecting envelopes" -- that is, using threats and intimidation to extort money from bookies and drug dealers. He also collected debts owed from loan sharking.[2]

In addition to his "collecting business," Ponzo was also involved in drug dealing. He bought cocaine from a man named John Mele and frequently rode with Vinny Marino (a/k/a Gigi Portalla) during the transactions with Mele. In turn, Ponzo sold this cocaine on the street.

---

[2] For example, one time Ponzo entered a restaurant, demanded repayment of a $25,000 loan owed to a loan shark, and threatened to kill the owner if he did not repay the money. A month after this conversation, the owner sold his restaurant and paid Ponzo the $25,000.

Following the death of Raymond Patriarca, the LCN's "boss," in 1984, confusion regarding leadership occurred. In the ensuing years, Frank Salemme began attempting to take control. Consequentially, a chasm occurred in the organization, with two factions fighting for control -- the Salemme faction and an anti-Salemme faction. In 1989, Salemme, leader of the Salemme faction, was shot multiple times at an IHOP restaurant but survived. Trial testimony revealed that Ponzo, along with Marino, shot at Salemme. The attempt on Salemme's life and wayward leadership created a powder keg within LCN.

In the summer of 1994, the intra-LCN conflict came to the fore. Ponzo and another LCN member, Michael Romano Jr., got arrested for possession of cocaine with the intent to distribute. Ponzo posted bail and was released. About a month later, Ponzo and Romano Jr. were driving to "collect an envelope" from Joseph Cirame when their car got a flat tire. Ponzo left the car and walked away to make a phone call. At this point, a car pulled up, and someone inside shot and killed Romano Jr. Trial testimony conflicted as to whether Ponzo was the target of the murder; however, testimony did show that Anthony Ciampi and Michael Romano Sr., also members of the anti-Salemme faction, questioned Ponzo's loyalty and blamed him for Romano Jr.'s death. Ponzo asserts that a man named David Clark intended to kill him but killed Romano Jr.

- 5 -

instead.  Anyway, about a month after the Romano Jr. murder, Ponzo (along with Sean Cote) shot Cirame, a member of the Salemme faction believed to be responsible for Romano Jr.'s death.

Meanwhile, in September 1994, the Commonwealth of Massachusetts charged Ponzo with assault with intent to murder in an unrelated case.  Roughly two months later, in November 1994, Ponzo failed to appear in state court on the possession of cocaine charges; accordingly, the court issued a warrant for his arrest. Ponzo hid from the arrest warrant at the home of his drug supplier, Mele.  While in hiding, Ponzo implored Mele to set him up with a marijuana-trafficking business in Arizona.  Obliging the request, Mele, after helping Ponzo move to Arizona, introduced him to the marijuana-shipping business, where these logisticians packaged the marijuana in Arizona and shipped the marijuana to Massachusetts.

In Arizona, Mele taught Ponzo how to package the marijuana and introduced him to Jesus Quintero and Steve Stoico, members of the marijuana conspiracy.  Ponzo also began using a false identity at that time -- Jeffrey Shaw.  Through the conspiracy, Ponzo and his co-conspirators purchased and shipped between 1,000 and 1,500 pounds of marijuana a year to the Bay State.

Several years after Ponzo departed Massachusetts, on April, 4, 1997, a federal grand jury indicted him and 14 others on charges stemming from their LCN-related conduct in Massachusetts.

In 1998, Cara Pace began a relationship with Ponzo -- that is, Jeffery Shaw, as she knew him. And in March 1999, Ponzo left Arizona with Pace and settled down in Marsing, Idaho, where they had two children.

Acting upon a tip, the FBI learned of Ponzo's location about 17 years after he fled Massachusetts. They investigated Ponzo for about a month after learning of his whereabouts. And on February 7, 2011, law enforcement arrested him at his Idaho home. The authorities confirmed his identity through fingerprint identification.

Following his arrest in Idaho, a federal grand jury in Massachusetts issued a superseding indictment against Ponzo, which included charges for his conduct in Arizona and two new charges for his activity in Massachusetts. After a 26-day trial, a jury convicted him of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d); conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c); conspiracy to distribute and to possess with the intent to distribute 500 grams or more of cocaine, in violation of

21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B); conspiracy to collect extensions of credit by extortionate means, in violation of 18 U.S.C. § 894(a)(1); use of extortionate means to collect extensions of credit, in violation of 18 U.S.C. § 894(a)(1); unlawful flight to avoid prosecution, in violation of 18 U.S.C. § 1073; conspiracy to distribute and to possess with intent to distribute at least 1,000 kilograms of marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); laundering of monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(1); and attempting to tamper with a witness, in violation of 18 U.S.C. § 1512(b)(1).

Which brings us to today, with Ponzo presenting 15 issues on appeal, though most of these have sub-issues too. For clarity's sake, we address his issues in chronological order -- starting with his pretrial claims and ending with his sentencing arguments.

## DISCUSSION

### I.    Grand Jury

Ponzo claims prosecutors improperly used the grand jury for trial preparation. The district court disagreed. And applying an "intermediate level of appellate scrutiny" -- a standard "more rigorous than the abuse-of-discretion or clear-error standards, but stopping short of plenary or *de novo* review," United States v.

Flemmi, 245 F.3d 24, 28 (1st Cir. 2001) (quotation marks omitted) -- we affirm.

The background events are easily summarized. In 2011, after his original indictment in 1997, the government sought a superseding indictment following Ponzo's arrest. Ponzo argued unsuccessfully in the district court that the government subpoenaed Annette Gestwicki and Leonard Senibaldi to testify before the subsequent grand jury for the purpose of preparing for trial on an offense for which he was already indicted -- the 1994 attempted murder of Cirame.

As for the law, all agree that the government cannot use a grand jury "*principally* to prepare pending charges for trial." Id. (emphasis added). All agree too that "when the new indictment charges new crimes . . . , it adequately evinces the propriety of the prosecutor's purpose" and so undercuts the grand-jury-abuse claim. Id. at 30. And because the superseding indictment here added additional charges, Ponzo cannot meet his "heavy burden" of showing grand jury abuse. See id. at 28.

## II. Joinder of Charges and Severance

Ponzo criticizes the government for improperly joining the Arizona marijuana and money-laundering charges with the Massachusetts LCN charges in a single indictment. See Fed. R. Crim. P. 8(a) (permitting joinder of counts against a single

defendant only if the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan"). In his mind, the two sets of charges involve different statutes, locations, modes of operation, and (for the most part) participants. And he blasts the district court for refusing to sever the allegedly incompatible charges. See Fed. R. Crim. P. 14(a) (authorizing severance "[i]f the joinder of offenses . . . appears to prejudice a defendant"). The government sees no error with the court's handling of the joinder/severance issues.[3] If we "find both misjoinder and actual prejudice, we must vacate the [judgment of] conviction." See United States v. Natanel, 938 F.3d 302, 307 (1st Cir. 1991) (citing United States v. Lane, 474 U.S. 438, 449 (1986)). But bearing in mind our standards of review -- *de novo* for the joinder issue and abuse of the discretion for the severance issue, see United States v. Meléndez, 301 F.3d 27, 35 (1st Cir. 2002) -- we see no reason to reverse.

Our reasoning is straightforward. Even assuming (without deciding) that misjoinder occurred, the error (if any) was harmless. Cf. United States v. Edgar, 82 F.3d 499, 504 (1st Cir. 1996) (taking a similar approach in a similar situation).

---

[3] The parties agree that Ponzo preserved these issues for our consideration.

- 10 -

And that is because -- as the government notes -- the joinder here did not "result in 'actual prejudice,'" defined "as the 'substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 504 (quoting Lane, 474 U.S. at 449). The court, after all, told the jury to consider each count separately. And "the case for prejudice is especially weak" when a court does precisely that. United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995). On top of that, the jury actually acquitted Ponzo on three counts -- which showed the jury could "discriminat[e] among the evidence applicable to each count," which helps undercut an actual-prejudice claim. See Edgar, 82 F.3d at 504.

Hold on, says Ponzo: Prejudice there surely was because the Arizona "marijuana and money laundering evidence would not have been independently admissible at trial of the [Massachusetts] charges, and the [Massachusetts] evidence would not have been independently admissible at trial of the Arizona marijuana and money laundering charges." But he fails to explain how or why this is so. And an "unexplained assertion" like this "is not enough to establish prejudicial joinder." Id. at 504 n.5 (quotation marks omitted). Well, then, writes Ponzo, prejudice there certainly was because "he was forced to decide between testifying as to all sets of charges or testifying as to none." To get anywhere, he had to "make[] a convincing showing that he

- 11 -

has both important testimony to give concerning one count and strong need to refrain from testifying on the other." See Meléndez, 301 F.3d at 36. And he believes he did so, claiming he argued below both that he "need[ed] to testify as to the flight from justice and the [Massachusetts] charges . . . to present his belief that he did not violate the law" when he skedaddled from the Bay State and that he "need[ed] to avoid testifying as to the money laundering charges, which flowed from the Arizona marijuana activity." But what he points to for support is a brief exchange he had with the court where he expressed concern about testifying because he did not want to incriminate himself on federal charges pending against him in Idaho -- an argument different from the one he makes here. So he waived his newly minted claim. See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) (stressing that "[a]n appellant cannot change horses in mid-stream, arguing one theory below and a quite different theory on appeal").

The net result of all this is that the district court's ruling stands.

## III.    Statute of Limitations

"Except as otherwise expressly provided by law," a five-year statute of limitations applies to non-capital crimes. See 18 U.S.C. § 3282(a). Alluding to that proviso, Ponzo argues that the government did not bring the following charges against him within

- 12 -

that five-year period:  (a) "the Arizona marijuana and money laundering charges"[4] and (b) the "new charges" of conspiracy and use of extortionate means to collect debt added by "the superseding indictment."[5]  But another statute provides an exception to § 3282(a), saying that "[n]o statute of limitations shall extend to any person fleeing from justice."  Id. § 3290.  Emphasizing that he fled from "state charges," Ponzo argues that the "natural reading" of this exception is that "flight from state charges [does not] toll[] the statute [of limitations] for federal charges for **different conduct**."  For support, he relies on a *dissenting* opinion in a Tenth Circuit case,[6] while conceding that "[s]everal circuits" -- the Second, Sixth, Ninth, and, of course, Tenth -- reject his view.[7]  Yet he still believes that the "charges should have been barred by the statute of limitations" and "dismissed with prejudice."  The government disagrees with Ponzo, unsurprisingly,

---

[4] Counts 11, 12, 13, and 14 on the verdict form, which correspond to counts 14, 15, 16, and 17 of the superseding indictment.

[5] Counts 6 and 7 on the verdict form, which correspond to counts 9 and 10 in the superseding indictment.

[6] See United States v. Morgan, 922 F.2d 1495, 1499 (10th Cir. 1991) (Logan, J., dissenting).

[7] See United States v. Rivera-Ventura, 72 F.3d 277, 281-84 (2d Cir. 1995); United States v. Hoffman, 124 F.3d 200, at *2-*4 (6th Cir. 1997) (unpublished table decision); United States v. Gonsalves, 675 F.2d 1050, 1052-53 (9th Cir. 1982); Morgan, 922 F.2d at 1497-98.

- 13 -

noting (among other things and without contradiction) that his theory -- that the statute of limitations barred his prosecution on these counts because his flight "should not toll the statute for subsequent, unrelated conduct" -- makes its début on appeal. Having carefully considered all aspects of the matter, we think Ponzo's theory does not fly, as we now explain.

Before trial Ponzo filed with the district court a document titled "NOTICE REGARDING STATUTE OF LIMITATIONS," which stated that he "reserve[d] his right . . . to raise a statute of limitations defense" as to the "new counts" if "the evidence as presented at trial" shows that the "new counts" were not timely. He then later moved for judgment of acquittal, arguing that "[a]s to the" new counts, the government did not prove "that the acts were committed within" § 3282(a)'s five-year limitations period and so "[j]udgment" on the new counts "should be entered" for him. The ramifications for Ponzo's appeal are clear:

As for the "Arizona marijuana and money laundering charges," because Ponzo failed to argue in the district court that his prosecution on those charges violated" § 3282(a), he "cannot successfully raise the statute-of-limitations defense" in this court. Musacchio v. United States, 136 S. Ct. 709, 713, 716 (2016). "[A] statute-of-limitations defense," the Supreme Court tells us, "becomes part of a case only if the defendant puts the

- 14 -

defense in issue." Id. at 718. If he "does not press the defense," then "there is no error for an appellate court to correct -- and certainly no plain error." Id. So "a district court's failure to enforce an unraised limitations defense under § 3282(a) cannot be plain error." Id. And because Ponzo argued below only that the "new charges" should be dismissed under § 3282(a), his argument here about the "Arizona marijuana and money laundering charges" is a no-go. See id.; see generally United States v. Ongaga, 820 F.3d 152, 161-62 (5th Cir. 2016) (applying Musacchio).

As for the "new charges," while Ponzo did raise a limitations defense before and during trial, he did not make the argument he makes here to the district court. So we review his claim only for plain error -- a difficult-to-meet "standard that requires him to show error, plainness, prejudice to [him] and the threat of a miscarriage of justice." United States v. Jones, 748 F.3d 64, 69 (1st Cir. 2014) (quotation marks omitted). But as he himself candidly admits, the circuits to consider the issue -- whether § 3290 tolls the limitations period for "subsequent, unrelated conduct" -- reject the argument he advances. So we are miles away from a plain error, to put it bluntly.[8] See, e.g.,

_____

[8] Ponzo says in one short sentence that "[t]he Government at least agreed in theory that 'It's true that the old Indictment did not toll anything because the new counts are new counts." We have no idea what this means, however. And Ponzo offers no explanation. So whatever the point is he is trying to make, we hold it waived.

- 15 -

United States v. Marcano, 525 F.3d 72, 74 (1st Cir. 2008) (per curiam); United States v. Gravenhorst, 190 F. App'x 1, 4 (1st Cir. 2006) (per curiam).

## IV.    Suppression of Evidence

Next, Ponzo faults the district court for denying his motion to suppress evidence seized from his Idaho home.  We need to cover a lot of ground -- so much so that we provide a short road map for the readers' convenience.  Part A sketches the background events.  Part B summarizes the parties' arguments.  Part C mentions the standards of review.  And Part D explains our take on the issues.

---

See Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (deeming "waived arguments confusingly constructed and lacking in coherence," noting that because judges are not psychics, "parties must spell out their issues clearly" (quotation marks omitted)).

Ponzo also makes a one-sentence claim that the superseding indictment was "deficient" on the extortion charges -- which, recall, were the "new charges" -- "because it did not name the victim."  Why he put this sentence in the *statute-of-limitations section* of his initial brief escapes us.  Anyhow, any defect or error here -- to the extent one existed at all -- was harmless because it in no way prejudiced Ponzo.  And that is because the government gave him the victim's name months before trial -- something the lower court relied on in denying his motion for a bill of particulars (a ruling he does not contest on appeal). Cf. generally United States v. Olano, 507 U.S. 725, 734-35 (1993) (emphasizing the centrality of prejudice to the harmless-error analysis).

- 16 -

A.    *Background*

In January 2011, the FBI got a tip that a man calling himself "Jay Shaw" who looked an awful lot like Ponzo lived at 6107 Hogg Road, Marsing, Idaho.[9]  After investigating the matter, the FBI believed it "highly likely" that the two men were one and the same.  On February 7, federal and state officers apprehended Ponzo on his way to see a neighbor.   He asked to speak with his attorney, though he did say he had two children and later said they were not home.  Concerned that the kids were home and would be all alone with him in custody, agents decided to see for themselves whether they were there or not.  So they knocked on the front door.   No one answered.   But they did hear a radio or television, so they peered through the window and saw what appeared to be a rifle (later determined to be an air rifle) and a security camera.  Satisfied that no one was in the house, agents left the property.  A fingerprint analysis done at the jail confirmed Shaw was Ponzo.

That very day, agents also talked to some of Ponzo's neighbors, a bunch of whom had known him as Jay Shaw and confirmed he lived at the Hogg Road address.  One of them added that Ponzo said that he owned guns.  The neighbor also remembered that Ponzo

_____

[9] All dates here are in the year 2011 unless otherwise specified.

- 17 -

had brought and used an AR-15 rifle when they went target shooting about four months earlier, in October 2010.

Based on this information, agents sought and received a warrant to search Ponzo's home for evidence related to his false identities, his income sources while living as fugitive, and his firearm possession. Executing the warrant on February 8 -- one day after his arrest -- agents found (among other things) a cache of guns, ammunition, and publications on creating false identifications, as well as an identification-making kit. Agents also found multiple computers.

Agents then sought and obtained a second warrant to search the computers, discs, and flash drives in the house for information relating to (among other things) Ponzo's false identities and financial support during his time on the lam. Returning to the house on March 28, they noticed that someone had pulled up the carpet in the master bedroom closet, revealing an empty floor safe that looked like it had been broken into. Agents called the person now leasing Ponzo's home, Kelly Verceles. Returning to 6107 Hogg Road, Verceles took the agents to see the safe's contents -- which included over $100,000 in cash, gold coins worth about $65,000, and more fake identification cards and driver's licenses with Ponzo's picture. Agents later learned that

Verceles and a co-worker had cut open the safe with an acetylene torch and had stolen the items.

Ponzo moved pretrial to suppress some of the evidence seized from his house -- we say "some" because he did not move to suppress the evidence produced by Verceles. The district court denied his motion without holding an evidentiary hearing, concluding that even if the agents' initial intrusion onto his property was unlawful, they had seized the challenged evidence through an "independent source" untainted by the supposedly illegal encroachment.

B.    *Parties' Arguments*

After criticizing the court for deciding the suppression motion "without the benefit of any testimony at all," Ponzo argues as follows against the court's ruling:  (a) Agents acted illegally when they peered through the window and spotted the air rifle and surveillance camera -- and excising that unlawfully obtained visual evidence from the February search warrant affidavit means no probable cause supported the February search warrant. (b) Agents noticed the computers during the illegal February search, which, again, flowed from the initial illegal entry onto his property -- and excising that unlawfully obtained visual evidence from the March search warrant affidavit means no probable cause supported the March search warrant either.  Also, (c) the

court should have suppressed the evidence Verceles produced because he had no actual or apparent authority to consent and because his consent was not voluntary.

The government has a markedly different view from Ponzo's: (a) The court assumed disputed facts in Ponzo's favor and decided the motion on purely legal grounds, eliminating any need for an evidentiary hearing. (b) Seeing the air rifle and surveillance camera through the window neither affected law enforcement's decision to seek any warrant nor influenced the magistrate's decision to issue a warrant -- plus the remaining portions of the affidavits were sufficient to establish probable cause. And (c) Ponzo waived the argument about the evidence obtained from the floor safe by not raising it below -- moreover, the argument clearly has no merit because Verceles voluntarily gave the items to the agents.

We agree with the government, for reasons we will get to after identifying the applicable standards of review.

C.    *Standards of Review*

We review the district court's decision to deny an evidentiary hearing only for abuse of discretion. See, e.g., United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013). And when considering a suppression ruling, we review legal questions

- 20 -

*de novo* and factual findings for clear error.  See, e.g., United States v. Hinkley, 803 F.3d 85, 90 (1st Cir. 2015).

D.    *Our Analysis*

The evidentiary-hearing issue is easily resolved.  A defendant has no right to an evidentiary hearing unless he shows "that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record" -- most critically, he "must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." Francois, 715 F.3d at 32 (quotation marks omitted).  Ponzo has not satisfied this burden.  The district court (don't forget) decided Ponzo's suppression motion after assuming -- for argument's sake, favorably to Ponzo -- that agents saw the air rifle and surveillance camera during an *illegal* search.  And Ponzo points to no facts in dispute that could undercut the court's "independent source" determination.  So we find no abuse of discretion here.

Moving on, we know that under the independent-source doctrine, evidence acquired from a lawful source that is independent of any Fourth Amendment infraction is admissible -- the thinking being that the exclusionary rule should not put agents "in a worse position" than if the constitutional infraction had not happened.  See Nix v. Williams, 467 U.S. 431, 443 (1984); see also Murray v. United States, 487 U.S. 533, 538 (1988) (emphasizing

- 21 -

that "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply").  And when dealing with

> a search warrant premised on an application containing illegally obtained evidence . . . the fruits of that search would be admissible through the independent source doctrine unless (1) "the agents' decision to seek the warrant was prompted by what they had seen during" the initial illegal search or (2) "information obtained during that [illegal search] was presented to the Magistrate and affected his decision to issue the warrant."

United States v. Soto, 799 F.3d 68, 82 (1st Cir. 2015) (quoting Murray, 487 U.S. at 542).  Because this is a disjunctive test, a defendant need only win under one of the two prongs.

Like the district court, we assume (without granting) that agents offended Ponzo's constitutional rights when they went up to his house and peeked through his window.  Turning to the first question, we, also like the district court, conclude that these agents would have sought a warrant even if they had not seen the air rifle and security camera.  We say this because law enforcement had known about Ponzo's fugitive-from-justice status, had concluded he was living under an assumed name at the 6107 Hogg Road address, and had heard about his having guns.  On the second question, we, again like the district court, conclude that the affidavit, shorn of any tainted info, contained ample facts to

support probable cause to search Ponzo's abode. Arguing against this conclusion, Ponzo claims the neighbor's comment that he "had gone to a shooting range . . . four months earlier [**a**] was fruit of the poisonous tree, [**b**] too stale to provide probable cause, and [**c**] did not support a finding that he would have firearms at his residence." We reject claim [**a**] because agents got the info from an independent interview with the neighbor. We reject claim [**b**] because "firearms, unlike drugs, are durable goods useful to their owners for long periods of time." United States v. Singer, 943 F.2d 758, 763 (7th Cir. 1991) (holding that six-month-old info about a firearm was not "stale"); see also United States v. Neal, 528 F.3d 1069, 1074 (8th Cir. 2008) (explaining that info "that someone is suspected of possessing firearms illegally is not stale, even several months later, because individuals who possess firearms tend to keep them for long periods of time"); cf. generally United States v. Pierre, 484 F.3d 75, 83 (1st Cir. 2007) (stressing that "[w]hen evaluating a claim of staleness, courts do not measure the timeliness of information simply by counting the number of days that have elapsed," adding that a court must instead "assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information"). And we reject claim [**c**] because the agent's affidavit said "firearms/ammunition" are "the kinds of

evidence . . . typically maintained at a person's" home -- that matters because the required nexus "between the objects to be seized and the premises searched" may be "inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide" evidence of the suspected crimes. See United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (quotation marks omitted).

Having found the February search warrant valid, we also reject Ponzo's theory that the computers seized during the warrant-backed search in March were the fruit of the poisonous tree.

That brings us to Ponzo's charge that the district court stumbled by "fail[ing] to address the illegality of the so-called 'consent search'" of the floor safe that Verceles had broken into. The problem here is that Ponzo did not argue in his suppression motion that the court should exclude the evidence Verceles had handed over, making the claim untimely. See United States v. Albertelli, 687 F.3d 439, 444 (1st Cir. 2012). And a court cannot consider an untimely claim unless "the party shows good cause." See Fed. R. Crim. P. 12(c)(3); see also United States v. Santiago-González, 825 F.3d 41, 46 n.7 (1st Cir. 2016). Ponzo makes no effort to show this. And he also makes no effort to explain why, in the absence of any such showing, he is entitled to review even

- 24 -

under the demanding plain-error standard.  So we treat this aspect of his suppression argument "as waived."  See United States v. Sepúlveda-Hernández, 817 F.3d 30, 34 (1st Cir. 2016).

**V.      Attorney Conflict of Interest**

Ponzo's next -- and perhaps most serious -- argument is that the district court saddled him with a conflict-ridden lawyer, court-appointed counsel John Cunha.  As Ponzo tells it, Cunha operated under two conflicts of interest, thereby violating his Sixth Amendment right to conflict-free representation.  The first potential conflict comes from Cunha's prior appellate representation of David Clark, the man Ponzo alleges tried to kill him.  The second potential conflict involves Cunha's prior representation of Robert Carrozza Jr., a former codefendant of a government witness -- Bobby Luisi Jr. -- in Ponzo's case. Reviewing *de novo*, see United States v. Martínez-Hernández, 818 F.3d 39, 46 (1st Cir. 2016), we reject Ponzo's conflict-of-interest contentions.

A.    *Guiding Principles*

The Sixth Amendment guarantees the right to conflict-free counsel.  See, e.g., Yeboah-Sefah v. Ficco, 556 F.3d 53, 68 (1st Cir. 2009).  And caselaw illustrates how this principle works.

For instance, caselaw holds that a lawyer's simultaneous representation of multiple codefendants at trial "inherently"

- 25 -

raises a potential conflict of interest. Mickens v. Taylor, 535 U.S. 162, 168 (2002) (discussing Holloway v. Arkansas, 435 U.S. 475, 489-90 (1978)). That being so, the Supreme Court has "create[d] an automatic reversal rule" for situations "where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined there is no conflict." Id. (discussing Holloway, 435 U.S. at 488). Simplifying our task, Ponzo's appellate lawyer told us at oral argument that he is not relying on the automatic-reversal rule -- which means we need say no more about that subject.

Turning, then, to situations where the automatic-reversal rule does not apply, we see that the high Court has required defendants there to show that "a conflict of interest actually affected" the lawyer's "performance -- as opposed to a mere theoretical division of loyalties." Id. at 168, 171 (emphasis removed). Unlike ineffective assistance claims governed by Strickland v. Washington, 466 U.S. 668, 687 (1984) -- a case requiring the defendant to show that counsel's performance was deficient and that this defective representation prejudiced the case's outcome -- prejudice is presumed if a defendant meets this test. Mickens, 535 U.S. at 166; see also United States v. DeCologero, 530 F.3d 36, 76-77 (1st Cir. 2008) (noting that adverse effect is much easier to show than the actual prejudice required

for "ineffective assistance of counsel claims"). And to show an actual conflict of interest, a defendant must demonstrate "that (1) the lawyer could have pursued a plausible alternative defense strategy or tactic and (2) the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties."[10] United States v. Colón-Torres, 382 F.3d 76, 88 (1st Cir. 2004) (quoting United States v. Soldevila-Lopez, 17 F.3d 480, 486 (1st Cir. 1994)); accord United States v. Cardona-Vicenty, 842 F.3d 766, 772-73 (1st Cir. 2016); see also DeCologero, 530 F.3d at 77 (emphasizing that "[s]howing an adverse effect . . . requires more than mere speculation").

Please note: Mickens said that Supreme Court caselaw "does not clearly establish, or indeed even support," applying the actual-conflict standard "unblinkingly" to situations -- like Ponzo's -- involving successive representation of clients. 535 U.S. at 174-75. But Mickens did not decide whether this standard applied in the successive-representation context, saying the question remained "open." Id. at 176. We too have not said whether the actual-conflict standard applies to cases of

---

[10] Prong one of this "test acts as a check on the possibility of a defendant twisting a mere conflict of opinion as to what is in the client's best interests into a 'conflict of interest' between client and attorney." Cody v. United States, 249 F.3d 47, 54 n.7 (1st Cir. 2001).

successive representation.  DeCologero, 530 F.3d at 77 n.24; see generally Reyes-Vejerano v. United States, 276 F.3d 94, 100 (1st Cir. 2002) (suggesting that an actual conflict may arise in successive-representation cases because "one client may stand to gain through negotiations with prosecutors that will injure another, raising concerns of loyalty; or information obtained in the representation of one client may be potentially useful to another, raising concerns of confidentiality," especially "if the first client is a possible witness at the second client's trial"). And because we can decide Ponzo's appeal without ruling on the standard, we provide him the benefit of the actual-conflict standard and once again reserve the question for another day.[11]

B.    *Conflict Involving David Clark*

The back story behind the first alleged conflict of interest is this.  Originally, Ponzo chose attorney David Duncan to represent him.  But after reaching irreconcilable differences regarding defense strategy, Ponzo moved for hybrid representation, so he could act as *pro se* co-counsel.  The magistrate judge denied

---

[11] Offering no legal authority supporting his point, Ponzo spends two sentences suggesting that because he raised the conflict-of-interest issue pre-trial, he "only" had to show "a division of loyalties" on Cunha's part, not "a conflict that affected" Cunha's "performance."  But his suggestion is so little developed that it is waived.  See, e.g., Muñiz v. Rovi, 373 F.3d 1, 8 (1st Cir. 2004) (deeming waived skeletal argument unaccompanied by "citation to any pertinent authority").

- 28 -

this motion, which led to Duncan's withdrawal as counsel. Later, the court appointed Cunha to represent Ponzo. On the first day of trial, 13 months into his representation, Ponzo moved *pro se* for a new attorney because, 12 years prior, Cunha had represented Clark, whom Ponzo claims tried to kill him but killed his friend -- Romano Jr. -- instead.

According to Ponzo, a key incident giving rise to the supposed conflict occurred in September 1994, when Romano Jr. was shot and killed. Trial testimony conflicted as to who shot Romano Jr. One account, however, placed Clark at the scene, with Ponzo as the intended target. The same day that Romano Jr. was murdered, Clark killed a state trooper during a traffic stop. And Cunha represented Clark on appeal after Clark's state-court conviction for the trooper's murder. Later, toward the end of 1994, Ponzo fled from Massachusetts to Arizona.

Ponzo brought this alleged conflict to the district court's attention on the first day of trial. In response, Cunha explained that "[t]here have been allegations sort of floating about, if you will, that Mr. Clark may have been one of the ones who shot at Michael Romano, Junior." Cunha went on to say that he did not see a conflict. The court agreed and denied Ponzo's *pro se* motion.

Ponzo asks us to reverse and remand for a new trial, arguing that Cunha "had no interest in painting Clark, his former client, as a killer or accusing him of uncharged conduct." Noting that 18 U.S.C. § 3290 tolls the statute of limitations if the accused "fle[d] from justice," Ponzo adds that the evidence he asked Cunha to introduce would have shown that he fled Massachusetts not to avoid prosecution but to save his life.[12] And that evidence would have removed his case from § 3290's reach, meaning some of the charges against him "would have been barred by the statute of limitations" -- or so he contends. Like the government, we disagree.

Admittedly, a lawyer faced with the prospect of accusing a former client of a murder -- one that occurred the same day as the murder for which the attorney previously defended that client -- may feel trapped between a rock and hard place. But Ponzo's contention -- that he hightailed it to Arizona not to duck prosecution but because he feared for his life -- is hard to reconcile with the fact that instead of leaving Massachusetts immediately after the threat to his life, he stayed and tried to kill Cirame two weeks later. Anyhow, Cunha's actions are easily

---

[12] As we noted many pages ago, § 3290 provides that "[n]o statute of limitations shall extend to any person fleeing from justice."

explained as a strategic attempt to distance Ponzo from LCN: Presenting the evidence advocated by Ponzo would have placed him right in the middle of the intra-LCN conflicts -- remember, the charges against him included RICO charges involving a crime syndicate, and so evidence suggesting participation in the organization would have inculpated him. Consistent with Supreme Court precedent holding that an actual conflict entails a conflict "that adversely affects counsel's performance," Mickens, 535 U.S. at 172 n.5, our caselaw says that forgoing an implausible strategy or a strategy that could inculpate the defendant does not constitute an actual conflict. See Cody, 249 F.3d at 54; Bucuvalas v. United States, 98 F.3d 652, 657 (1st Cir. 1996); Guaraldi v. Cunningham, 819 F.2d 15, 17-18 (1st Cir. 1987). And these decisions throw cold water on Ponzo's first conflict claim.

C.    *Conflict Involving Robert Carrozza Jr.*

Even less need be said about Ponzo's alleged conflict flowing from Cunha's prior representation of Robert Carrozza Jr. in an unrelated matter. "The conflict arises," Ponzo writes, "because when [Cunha] represented Carrozza[] Jr., he [Carrozza Jr.] was a co-defendant of Bobby Luisi Jr." -- a person who testified against Ponzo at trial and admitted to trying to kill Ponzo. The government brought this potential conflict to the court's attention. Though he had "very little memory of the case,"

- 31 -

Cunha did tell the court that Luisi Jr. had separate counsel and that no joint-defense agreement existed. Stressing that he "never really represented [Carrozza Jr.]," Cunha added that he withdrew from representing Carrozza Jr. after another lawyer began negotiating a plea agreement for him. The court concluded that no conflict existed. We agree. Ponzo speculates that Cunha's "prior representation . . . could have affected his representation of Ponzo." But he offers nothing to back up that speculation. And mere speculation does not suffice to show a Sixth Amendment infraction. See, e.g., Cardona-Vicenty, 842 F.3d at 773. Consequently, Ponzo's second conflict argument is no more convincing than the first.[13]

## VI.     Sixth Amendment Right to Participate in One's Defense

We now address Ponzo's preserved claim that the district court violated his Sixth Amendment right to participate in his own defense by not giving him hearing aids costing $2,000. What the Sixth Amendment requires for hearing-impaired defendants is apparently a question of first impression in our court. Following

---

[13] Ponzo floats the idea that the district court wrongly denied him the right to use "seized, untainted funds to retain counsel," without showing that the funds were indeed untainted. And this lack of developed argumentation dooms his claim. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

the parties' lead, we look to caselaw involving non-English speaking defendants for guidance, knowing that this sort of inquiry is inherently fact-intensive and thus receives abuse-of-discretion review. See United States v. Carrion, 488 F.2d 12, 14 (1st Cir. 1973) (noting that "considerations of judicial economy" require that "the trial court, coming into direct contact with the defendant, be granted wide discretion in determining whether an interpreter is necessary").

Relying on cases involving non-English speaking defendants, a sibling circuit has held -- in a case Ponzo relies on -- "that the Sixth Amendment right to participate in one's own trial encompasses the right to reasonable accommodations for impairments to that participation, including hearing impairments." United States v. Crandall, 748 F.3d 476, 481 (2d Cir. 2014). Assuming *arguendo* the applicability of this framework, we think Ponzo has not shown a lack of a reasonable accommodation.

According to an audiologist's report, Ponzo suffers from "moderate" hearing loss -- a level of hearing loss that would "prevent [him] from hearing most conversation unless at close range." Acting to accommodate this impairment, the district court provided him with (a) headphones that amplified the sounds in the courtroom and (b) real-time transcripts. Ponzo calls the headphones inadequate because they supposedly prevented him from

"consult[ing] with his attorney during the trial," apparently because they made him "unable to speak and listen at the same time." But as the government asserts (without contradiction), Ponzo never claimed below that he could not communicate with counsel by passing notes while wearing the headphones. And he advances no persuasive argument here suggesting that hearing aids costing $2,000 were the only reasonable accommodation for his condition. Ponzo does protest that as a "public entity," the district court had to give him the hearing aids "under the Americans with Disabilities Act." But he makes no convincing argument that "public entity" includes the federal courts. Cf. generally Roman v. Jefferson, 495 F. App'x 804, 806 (9th Cir. 2012) (concluding that "[w]hile the [Act] requires state courts to make disability accommodations, [it] does not apply to federal courts" (citing 42 U.S.C. § 12131(1))).[14]

---

[14] The Act defines "public entity" as

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

42 U.S.C. § 12131(1)(A)-(C).

Discerning no hint of abused discretion in this situation, we trudge on.

## VII.  Prior Testimony of an Unavailable Witness

Ponzo argues further that the district court violated his rights under the Confrontation Clause by admitting the testimony of Mark Hildonen -- a witness who had testified at Ponzo's co-conspirators' 1998 trial but who had died before Ponzo's 2013 trial.  Because we are dealing with a preserved claim of error, our review is *de novo*.  See United States v. Liriano, 761 F.3d 131, 136 (1st Cir. 2014).  But there is simply no error here for us to remedy.

The Confrontation Clause -- which gives a criminal defendant "the right . . . to be confronted with the witnesses against him," see U.S. Const. amend. VI -- bars admission of testimonial hearsay unless "the declarant is unavailable" and "the defendant had a prior opportunity" for cross-examination, see Crawford v. Washington, 541 U.S. 36, 59 (2004).  But a defendant's confrontation rights are subject to certain exceptions, including the forfeiture-by-wrongdoing exception -- a common-law doctrine that allows admission of unconfronted testimonial statements "where the defendant ha[s] engaged in wrongful conduct designed to prevent a witness's testimony."  Giles v. California, 554 U.S. 353, 366 (2008); see also Crawford, 541 U.S. at 62 (stressing that

"the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds"); United States v. Houlihan, 92 F.3d 1271, 1279 (1st Cir. 1996) (explaining that it suffices "to show that the evildoer was motivated *in part* by a desire to silence the witness; the intent to deprive the prosecution of testimony need not be the actor's *sole* motivation").

The rationale underlying this exception -- that "a defendant should not be permitted to benefit from his own wrong," see Giles, 554 U.S. at 365 -- supports its application here. Had Ponzo been at the 1998 trial, he could have cross-examined Hildonen. But like a defendant who obtains a witness's absence by killing him, by fleeing and remaining on the lam for years, Ponzo effectively schemed to silence Hildonen's testimony against him. And Hildonen's subsequent unavailability signifies the success of that scheming. So Ponzo forfeited his confrontation right. See Barker v. Morris, 761 F.2d 1396, 1400-03 (9th Cir. 1985) (finding that defendant's "lack of opportunity" to cross-examine a witness was "directly attributable to [his] fugitive status"); United States v. Dikeocha, 218 F.3d 706, 712 n.5 (7th Cir. 2000) (noting that if the defendant had "not been a fugitive" he could have cross-examined the unavailable witness at his co-defendants' trial). To hold otherwise would allow Ponzo to profit from his

wrongful conduct and would undermine the "integrity of the criminal-trial system" -- which we cannot allow. See Davis v. Washington, 547 U.S. 813, 833 (2006).

Looking for a way out this predicament, Ponzo says that because he "fled Massachusetts three years before this [federal] indictment" and "was living in hiding from his past," we "cannot simply presume that he was even aware of the indictment, let alone the 1998 trial." But because he cites no authority for this argument (nor does he give us a convincing explanation of what the law should be, assuming he found no authority), he has waived it. See, e.g., Muñiz, 373 F.3d at 8; see also United States v. Acosta-Colon, 741 F.3d 179, 193 (1st Cir. 2013) (emphasizing that a party's not "liv[ing] up to his obligation to develop[] a sustained argument out of . . . legal precedents . . . leads to waiver" (quotations omitted)). Ponzo also talks down Barker, saying it is "pre-Crawford law." But he does not explain why that matters, particularly since Supreme Court caselaw makes clear that a defendant's confrontation rights remain subject to the forfeiture-by-wrongdoing exception. See Giles, 554 U.S. at 366; Crawford, 541 U.S. at 62.

## VIII.  Testimony of Co-conspirators

Ponzo accuses the district court of committing reversible error by admitting (a) testimony from co-conspirators

-- Mark Weddleton and Paul Piano -- who talked about the marijuana activities in Arizona *after* he supposedly "left"; and (b) testimony about his co-conspirators' doings at Ciampi's club in 1992, given that he supposedly did not visit the club until 1994. The parties wrangle over the standard of review. Believing he preserved these evidentiary arguments, Ponzo says abuse-of-discretion review applies. The government, meanwhile, thinks Ponzo preserved all claims except for his challenge to Weddleton's testimony. And the government asks us to apply plain-error review to that challenge. Firing back, Ponzo contends he "had a standing objection to co-conspirator statements," which, he adds, "preserved" the issue for abuse-of-discretion analysis. We need not referee this tussle, however: even assuming, favorably to Ponzo, that abuse-of-discretion scrutiny applies throughout, his claim of error fails.

We start with Ponzo's argument that Weddleton's and Piano's testimony was inadmissible because he had "withdrawn" from the Arizona conspiracy before they had joined it. Co-conspirators' statements "made during the course of the conspiracy and made in furtherance of the conspiracy are admissible." United States v. Fields, 871 F.2d 188, 199 (1st Cir. 1989) (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948)); see also Fed. R. Evid. 801(d)(2)(E). Ponzo had the burden of establishing his withdrawal. See, e.g., United States v. Eppolito, 543 F.3d 25, 49 (1st Cir.

- 38 -

2008). To withdraw from a conspiracy, a person must "act affirmatively either to defeat or disavow the purposes of the conspiracy." United States v. Paz-Alvarez, 799 F.3d 12, 26 n.13 (1st Cir. 2015) (quotation marks omitted). Typically, that requires the accused to come clean with the authorities or communicate with "his co-conspirators that he has abandoned the enterprise and its goals." United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam). Ponzo points to no evidence suggesting he did either. Instead, he talks up evidence indicating he had stopped working with certain conspirators. But "the '[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal.'" United States v. Ngige, 780 F.3d 497, 503-04 (1st Cir. 2015) (alteration in original) (quoting United States v. Ciresi, 697 F.3d 19, 27 (1st Cir. 2012)). Therefore, Ponzo did not establish withdrawal from the conspiracy.

As a fallback, Ponzo claims Weddleton and Piano joined the conspiracy only *after* he "had left." But the evidence shows Mele recruited both Weddleton and Piano to receive marijuana shipments in Massachusetts during the time Ponzo was shipping marijuana from Arizona. So this contention goes nowhere.

Taking a slightly different tack, Ponzo notes how Weddleton testified that David Rudolph -- Ponzo's previous roommate -- described Ponzo as "a smart guy" who knew the marijuana

- 39 -

"business good." As Ponzo sees things, that evidence was inadmissible hearsay under Rule 801(d)(2)(E). We think not. Having already reasoned that Ponzo had not withdrawn from the conspiracy, we need only consider whether the challenged testimony furthered the conspiracy. Testimony furthers the conspiracy if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." United States v. Fogg, 666 F.3d 13, 15 (1st Cir. 2011) (quotation marks omitted). Judged against this standard, Rudolph's statements satisfy the "in furtherance" requirement because they showed Ponzo's role in the conspiracy or alternatively bolstered his standing within the organization since they characterized him as an experienced marijuana packer. See, e.g., United States v. Correa-Osorio, 784 F.3d 11, 25 (1st Cir. 2015) (noting that "the 'in furtherance' requirement can be satisfied (among other ways) by statements identifying other conspirators, explaining how the conspiracy works, or updating members on the conspiracy's doings"); Ciresi, 697 F.3d at 29-30 (finding that statements of reassurance further the conspiracy).

That leaves us with Ponzo's argument that the court erred by admitting evidence about illegal activities at Ciampi's club in 1992 when he allegedly did not go there until 1994. The court did not reversibly err for a simple reason: Ponzo joined the conspiracy in 1989, and these activities took place during his

participation in the conspiracy.  Also, Ponzo does not dispute that the illegal acts, as described in the testimony, furthered the conspiracy -- so we say no more about that subject.

The bottom line is that the district court did not abuse its discretion by admitting this testimony.

## IX.    Sufficiency of Evidence

Ponzo attacks the sufficiency of the evidence on two of the nine racketeering acts underlying his RICO conspiracy conviction:  the attempted murder of Cirame and the assault with the attempt to murder Cirame.  Ponzo also questions the sufficiency of the evidence supporting the finding that he had conspired to distribute 500 grams or more of cocaine.  Because he preserved neither challenge, our review is limited to preventing a "clear and gross injustice" -- a "stringent standard, which we have described as a particularly exacting variant of plain error review."  United States v. Foley, 783 F.3d 7, 12-13 (1st Cir. 2015).  As per usual, we view the evidence in the light most favorable to the government, taking all reasonable inferences in its favor.  See, e.g., United States v. Rodríguez-Milián, 820 F.3d 26, 31 (1st Cir. 2016).  But there is not so much as a whiff of a clear and gross injustice here, though Ponzo would still be out of luck "even under traditional plain error."  See Foley, 783 F.3d at 13.

A.    *The Cirame Shooting*

The jury found that Ponzo had committed nine predicate acts -- well beyond the two predicate acts necessary for a RICO violation.  See 18 U.S.C. § 1961(5) (specifying that a pattern of racketeering activity requires only two predicate acts committed within 10 years of each other); see also United States v. Marino, 277 F.3d 11, 18-19 (1st Cir. 2002).  He, again, only challenges the jury's findings on the two having to do with the Cirame shooting -- to be precise, he is contesting the legal (rather than the factual) sufficiency of the government's proof, given he questions the lawfulness of certain rulings admitting certain evidence.  But because he does not show any defects with the other seven predicate acts, his first sufficiency claim is a nonstarter. See generally United States v. Dhinsa, 243 F.3d 635, 670 (2d Cir. 2001) (noting that "the jury's findings of two predicate acts, lawfully constituting a RICO pattern, and of the other elements of a RICO offense, will permit affirmance of a RICO conviction notwithstanding the invalidation of other predicate acts," and further noting that the defective predicate did not "dominate" this prosecution, "eclipsing all else" (internal quotations omitted)); United States v. Paccione, 949 F.3d 1183, 1197-98 (2d Cir. 1991) (finding that a "deficiency" with one predicate act did

not require reversal of the RICO convictions because the remaining eight predicate acts "suffer[ed] no defects").[15]

B.    *The Cocaine Conspiracy*

A count in the superseding indictment charged that from "in or before 1989" through "in or after October 1994," Ponzo conspired with others "known and unknown to the Grand Jury . . . to possess with intent to distribute, and to distribute, . . . 500 grams or more . . . of cocaine."  And the evidence at trial -- viewed from a prosecution-friendly vantage point -- showed the following:  Mele regularly sold one-ounce quantities (28.35 grams) of cocaine to Marino in the mid to late 1980s.  And Ponzo helped Marino deliver the cocaine.  Mele also sold Ponzo "eight balls" (1/8 ounce, or about 3.5 grams each).  Ponzo was still distributing cocaine with Marino in the early to mid-1990s, delivering cocaine to one of Marino's customers "a couple of times" a week.  Around this time, Ponzo hooked up with Romano Sr. -- a distributor buying up to six ounces (170 grams) per transaction from a supplier -- as

_____

[15] If more were needed -- and it is not -- we note the following.  The government proves racketeering when it proves two predicate acts of racketeering "or, alternatively, when it proves the collection of a single unlawful debt."  United States v. Weiner, 3 F.3d 17, 23 (1st Cir. 1993).  And not only did Ponzo's jury find the requisite predicate acts, but it also found the collection of an unlawful debt -- a finding he does not challenge. So even if he could get some mileage out of his predicate-act argument (and he cannot), the conviction on the RICO count would still stand.

evidenced by Ponzo's presence at a meeting where the participants discussed the cocaine-distribution business and divvyed up distribution shifts. The government need have proved only that it was reasonably foreseeable by Ponzo that conspiracy members would handle over 500 grams of cocaine. See United States v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993) (emphasizing that "a defendant is responsible for drugs he personally handled or anticipated handling, and, under the relevant conduct rubric, for drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy"). With all of this in mind, we conclude that the evidence sufficiently connected Ponzo to the cocaine conspiracy that involved 500 grams or more of cocaine -- at the very least, the evidence is not so insufficient as to cause a clear and gross injustice.

## X.      Waiver of Right to Testify

Before waiving his right to testify, Ponzo asked the district court two questions: First, could the prosecution "cross-examine[]" him on charges pending against him in Idaho? And second, could the prosecution use his "prior convictions" to "cross-examine" him? Saying "I'm not in a position to advise you," the court directed Ponzo to discuss the matter with his attorney -- which Ponzo did before waiving his right to testify. Noting that he had a constitutional right to testify, Ponzo argues for

- 44 -

the first time on appeal that his waiver was not knowing and voluntary because the court did not answer his questions. Our review is for plain error. And we find none.

We begin with the obvious: "The defendant's lawyer, rather than the trial judge, bears the primary responsibility of informing and advising the defendant of this right, including its strategic ramifications," Casiano-Jiménez v. United States, 817 F.3d 816, 820 (1st Cir. 2016) -- hence "a trial judge is not required to apprise a defendant of his right to testify or inquire whether he has waived it," Owens v. United States, 483 F.3d 48, 58 (1st Cir. 2007). And Ponzo offers no convincing argument for how the court plainly erred given Casiano-Jiménez and Owens. Critically too, Ponzo cites no controlling authority showing that the court had to answer his questions -- which is not the way to go about showing plain error. See United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016) (explaining that "plain error" is "an indisputable error by the judge, given controlling precedent" (quotation marks omitted)).

## XI. Prosecution's Conduct

Ponzo next maintains that three instances of prosecutorial misconduct require a new trial. Because he did not preserve the points below, he is stuck with having to show plain error -- something he has not done.

A.     *Examination of Ponzo's Former Attorney*

First up is Ponzo's claim that the government improperly questioned his former attorney, James Costello, about the Arizona marijuana conspiracy.  This is what you need to know.

Costello had represented Ponzo in 1994 on the state cocaine and assault charges.  The government called Costello to establish that Ponzo had failed to appear in state court in November 1994, causing that court to issue a warrant.  Costello moved to quash the subpoena, saying that "[w]ithout a waiver from Ponzo, [he] is duty bound to assert the attorney-client privilege to the questions he anticipates the government will ask.  The district court ruled that Costello could testify about Ponzo's failure to appear in state court in 1994 but could "not testify about anything else," believing that that would infringe upon the attorney-client privilege.

At trial, after Costello testified that he had been suspended from the practice of law from 1997 to 2007, the government asked him if he knew Piano.  Costello replied, "I believe I do, yes, sir. I don't know him, but he's an acquaintance."  The government then asked Costello whether Piano had "pick[ed] up any packages from you[.]"  Ponzo's lawyer objected before Costello could answer.  "What time frame are we talking about?" the court asked.  "In approximately 1998 or 1999," the

- 46 -

government's lawyer responded.  And after a sidebar conference to discuss the matter, the government decided to ask Costello no further questions.

Despite Ponzo's arguments, we have some doubts whether the government's queries violated the district court's ruling on the motion to quash, since we question whether the questions touched on privileged attorney-client communications.  But putting that aside, we fail to see how either question prejudiced Ponzo.  Ponzo spends no time explaining how he suffered prejudice.  And although the second question may have suggested that Costello was somehow involved in marijuana trafficking, the query went unanswered, plus the court told the jury that lawyers' questions are not evidence.  See United States v. Innamorati, 996 F.2d 456, 485 (1st Cir. 1993) (finding no prejudice where witness did not answer the challenged question and the court instructed the jury that lawyers' statements are not evidence); see also United States v. Robinson, 473 F.3d 387, 394 (1st Cir. 2007) (noting that demonstrating prejudice is "more difficult" when questions go unanswered).  So we cannot say that the complained-of errors rise to the level of plain error.

B.    *Characterizations of the Evidence*

Second up is Ponzo's claim that the government mischaracterized evidence during closing arguments.  It is a truism

that prosecutors cannot refer to facts not in evidence.  See, e.g., United States v. Auch, 187 F.3d 125, 129 (1st Cir. 1999).  But they can "ask jurors to draw reasonable inferences from the evidence."  United States v. Meadows, 571 F.3d 131, 145 (1st Cir. 2009).  And after carefully reviewing Ponzo's claims, we can say that none warrants reversal because the prosecutor confined his comments to evidence in the record and to reasonable inferences from that evidence.  Two examples suffice to illustrate the point. The government mentioned that Quintero had said that Ponzo had "shot a .223 or an AK rifle in his free time" in Arizona -- a statement that Ponzo claims implies that he had a hand in shooting Salemme.  But Quintero did testify that he and Ponzo shot "rifles," though he could not specifically recall whether "it was a .223." And the government made no reference to the Salemme shooting in this context.  The government also said that killing Salemme was Marino's and Ponzo's "ticket" to getting "made."  But Mele did testify that Marino would "become a made guy" if "Salemme died." And the government's statement that Ponzo would get "made" too was premised on a fair inference from this evidence.  The long and the short of it is that nothing Ponzo complains about here amounts to plain error.

C.      *Vouching*

Third up is Ponzo's claim that the government's use of the word "we" (e.g., "We know," "We learned") during closing argument constituted improper vouching -- which "occurs when the government place[s] the prestige of the United States behind a witness by making personal assurances about the credibility of a witness . . . or implies that the jury should credit the government's evidence simply because the government can be trusted." Robinson, 473 F.3d at 396 (quotation marks omitted) (alteration in original). "[W]hen a defendant fails to object at trial we are not inclined to find improper meaning in a prosecutor's statement if there is a plausible alternative." United States v. Rodriguez, 675 F.3d 48, 65 (1st Cir. 2012). The plausible alternative here -- and the one the record supports -- is that the prosecutor used "we" to rehash the evidence heard at trial, not to throw the weight of the prosecutor's office behind the evidence to establish credibility. Also undermining Ponzo's argument is the fact that he cites no controlling authority finding prosecutorial misconduct under similar circumstances -- which means he has not shown plain error. See, e.g., Morosco, 822 F.3d at 21.

## XII. Verdict Form

We now address Ponzo's argument that the verdict form allowed the jury to convict him on the § 924(c) firearm count for merely possessing a firearm in relation to a crime of violence, as opposed to using or carrying the firearm. Because he did not object to the verdict's form before the jury retired to deliberate, we review only for plain error. See United States v. Edelkind, 467 F.3d 791, 795-96 (1st Cir. 2006). And we see nothing of the sort here.

The current version of § 924(c) covers "any person who, during and in relation to any crime of violence . . . , *uses* or *carries* a firearm, or who, in furtherance of any such crime, *possesses* a firearm." See § 924(c)(1)(A) (emphasis added). But, both sides tell us, the version in effect at the time of the offense alleged in the § 924(c) count here covered only the "use or carry" of a firearm, not possession. Unfortunately, the verdict form wrongly captioned the § 924(c) firearm count as "firearm possession in relation to murder conspiracy" -- wrongly, because (again) the offense charged required using or carrying a firearm, not mere possession. Studying "the verdict form as a whole," however, "in conjunction with" the jury charge, as we must, United States v. Rodríguez, 735 F.3d 1, 11 (1st Cir. 2013) (quotation marks omitted), we see that the court correctly instructed the

jury, stating that "the government must prove the defendant knowingly used or carried a firearm" -- and then the court went on to define use and carry. We of course presume that jurors obey a court's instructions. See, e.g., United States v. Gemma, 818 F.3d 23, 37 (1st Cir. 2016). And based on the correct, in-depth instruction and the presumption that jurors follow instructions, we cannot find that the error affected Ponzo's substantial rights because we cannot say that it likely affected the jury verdict. So the error does not qualify as plain error. See, e.g., Rodríguez, 735 F.3d at 11-12 (finding that a jury-verdict form that mischaracterized the burden of proof did not affect a defendant's substantial rights where the court properly instructed the jury and the defendant advanced nothing to suggest prejudice).

Undaunted, Ponzo argues that the jury's answers to the § 924(c) count's special-verdict questions suggests that it "did not find that he had 'used'" a firearm. These questions covered certain weapons -- like machine guns and shot guns -- that the government says (without contradiction) would have increased the mandatory-minimum sentence under the relevant version of § 924(c). Ponzo cites no authority holding that leaving this section blank shows that the jury convicted him for less than "using" or "carrying" a gun. Thus, we stand by our no-plain-error conclusion. See Morosco, 822 F.3d at 21.

## XIII.  Conviction Under § 924(c)

Ponzo argues in a supplemental brief that we should toss out his § 924(c) firearm conviction.  His reasoning runs something like this:

- The jury convicted him of using or carrying a firearm during a "crime of violence."  See § 924(c)(1)(A).

- A "crime of violence" is an offense that "(A) has as an element the use, attempted use, or threatened use of physical force against the person . . . , or (B) that by its nature, involves a substantial risk that physical force against the person . . . may be used in the course of committing the offense."  Id. § 924(c)(3).  Subsection (A) is known as the "force clause."  And subsection (B) is known as the "risk of force clause" or the "residual clause."

- The § 924(c) firearm count listed conspiracy to commit murder under state law as the crime-of-violence predicate for the § 924(c) violation.

- But, to his way of thinking, "[a] conspiracy" -- to quote his brief -- "is an agreement to do something and does not have as an element the use, attempted use or threatened use of physical force."  Plus, he adds, § 924(c)'s risk-of-force clause is similar to the Armed Career Criminal Act's residual clause, which the Supreme Court struck as unconstitutionally

- 52 -

vague in <u>Johnson</u> v. <u>United States</u>, 135 S. Ct. 2551, 2556 (2015). And, he points out, § 924(c)'s risk-of-force clause is identical to a risk-of-force clause in 18 U.S.C. § 16(b), which some circuits have held to be unconstitutional under <u>Johnson</u>.

- Ergo -- and to quote again from his brief -- he "cannot be guilty of carrying/using a firearm in connection with a crime of violence because the underlying crime was not a crime of violence."

Because Ponzo did not raise this argument below, we again review for plain error only. And we again find no plain error exists.

We jump to § 924(c)'s risk-of-force clause, because that is the simplest way to deal with this issue. <u>See generally</u> <u>Stor/Gard, Inc.</u> v. <u>Strathmore Ins. Co.</u>, 717 F.3d 242, 248 (1st Cir. 2013) (noting that "[t]he simplest way to decide a case is often the best" (quoting <u>Chambers</u> v. <u>Bowersox</u>, 157 F.3d 560, 564 n.4 (8th Cir. 1998))). The question presented -- whether § 924(c)'s risk-of-force clause is invalid under <u>Johnson</u>'s reasoning -- is an open one in our circuit. True, the Seventh Circuit held § 924(c)'s risk-of-force clause unconstitutional given <u>Johnson</u>'s logic. <u>United States</u> v. <u>Cardena</u>, 842 F.3d 959, 996 (7th Cir. 2016). But the Second, Sixth, and the Eighth Circuits reached the opposite result. <u>See, e.g.</u>, <u>United States</u> v.

- 53 -

Hill, 832 F.3d 135, 145-50 (2d Cir. 2016); United States v. Taylor, 814 F.3d 340, 375-79 (6th Cir. 2016); United States v. Prickett, 839 F.3d 697, 699-700 (8th Cir. 2016). True too, the Third, Sixth, Seventh, Ninth, and Tenth Circuits said Johnson nullifies § 16(b)'s risk-of-force clause -- a clause worded identically to § 924(c)'s risk-of-force clause, as Ponzo notes. See Baptiste v. Attorney Gen., 841 F.3d 601, 615-21 (3d Cir. 2016); Shuti v. Lynch, 828 F.3d 440, 445-51 (6th Cir. 2016); United States v. Vivas-Ceja, 808 F.3d 719, 721-23 (7th Cir. 2015); Dimaya v. Lynch, 803 F.3d 1110, 1114-20 (9th Cir. 2015), cert. granted, 137 S. Ct. 31 (2016) (oral argument Jan. 17, 2017); Golicov v. Lynch, 837 F.3d 1065, 1069-75 (10th Cir. 2016). But the Fifth Circuit, sitting *en banc*, rejected that view. See United States v. Gonzalez-Longoria, 831 F.3d 670, 674-78 (5th Cir. 2016) (en banc); see also Hill, 832 F.3d at 149 (noting that while some circuits used Johnson to nix § 16(b), these decisions are "unpersuasive" and so did not change the court's view that § 924(c)'s risk-of-force clause is not unconstitutionally vague); Taylor, 814 F.3d at 379 (same). And given the conflicting precedents on the question at hand, any error here (if error there was) was not plain. See, e.g., United States v. Pabon, 819 F.3d 26, 34 (1st Cir.), cert. denied, 127 S. Ct. 345 (2016); United States v. Goodhue, 486 F.3d 52, 57 (1st Cir. 2007).

Perhaps it is possible for there to be plain error in a case where many other circuits make the same mistake, so long as it is clear that they are clearly wrong. But Ponzo attempts no argument along these lines, even though he bears the burden of showing plain error. See, e.g., United States v. Rodríguez-Soler, 773 F.3d 289, 293 (1st Cir. 2014). So we say no more about that point.

## XIV. Sentencing Calculations

Turning to sentencing, Ponzo makes three broad claims: that the court violated the Constitution's Ex Post Facto Clause by using the 2013 version of the federal sentencing guidelines; that the court miscalculated his criminal history; and that the court wrongly labeled him a career offender. Ponzo preserved the ex post facto issue -- so our review is *de novo*. See United States v. Goergen, 683 F.3d 1, 3 (1st Cir. 2012). He preserved some but not all of his criminal-history arguments -- preserved issues involve different standards, e.g., clear error for factual findings and *de novo* for questions of law, see United States v. Maldonado, 614 F.3d 14, 17 & n.2 (1st Cir. 2010); an unpreserved contention receives plain-error review, naturally. And he preserved the career-offender issue -- so our review is *de novo*. See United States v. Velázquez, 777 F.3d 91, 94 (1st Cir. 2015). When all is said and done, though, we leave his sentence intact.

A.    *Ex Post Facto*

Sentencing a defendant convicted of multiple counts is no picnic.  The guidelines tell courts to "group" the counts that "involv[e] substantially the same harm," U.S.S.G. § 3D1.2, and then do "group-by-group, not count-by-count, sentencing calculations."  United States v. Bivens, 811 F.3d 840, 842 (6th Cir. 2016) (citing U.S.S.G. §§ 3D1.3, 3D1.4).  At the risk of oversimplification, here is how that ordinarily works:  the court computes "the offense level for each count within each group, attributes to each group the highest offense level of any count within it" after factoring in certain adjustments for those counts, "compares the groups to ascertain which has the highest offense level, considers certain further adjustments . . . , and sentences the defendant based on that triage."  See United States v. Florence, 143 F.3d 11, 14 (1st Cir. 1998); see also U.S.S.G. § 3D1.3 cmt. n.2.

At sentencing, Ponzo -- appearing *pro se* (with his trial attorney as standby counsel) -- argued that to avoid an ex post facto problem, the court should not use the guidelines in effect at the time of sentencing but should instead use those in vogue when the crimes were committed.  See generally United States v. Mehanna, 735 F.3d 32, 67 (1st Cir. 2013) (emphasizing the "general rule" that absent ex post facto problems, a sentencer "should use

the version of the guidelines in effect at the time of the disposition hearing").  The court thought Ponzo had a point but said it "need not decide that question because applying the earlier versions of the guidelines to certain count groups" would produce "the same guideline range of 360 months to life as would result from applying" the current guidelines -- though the court, having concluded that it made no difference which guidelines applied, stated it was applying the newer guidelines (i.e., the 2013 version).  So the court grouped the convictions into eight groups and then used the older guidelines to do the calculations.  Skipping over details not relevant here, the court concluded that Group 3 -- comprised of the racketeering conspiracy, the drug conspiracies, and the money-laundering counts -- had the highest adjusted offense level.  And after applying what is called a "multiple count adjustment," the court pegged Ponzo's total offense level at 38 -- which, when paired with a criminal history category of V or VI (the court said it did not matter which), yielded a guidelines range of 360 months to life.  The court ultimately gave him 336 months, a sentence that included the 60 months the court had to impose for his § 924(c) conviction.[16]

---

[16] Given the court's approach, Ponzo's challenges to groups other than Group 3 are irrelevant.

Ponzo basically rehashes the ex post facto argument he made below, telling us that the court's use of the "newer guidelines" infracted his constitutional rights. But we see no violation because, as the district court showed, the guidelines range was the same under both the older and newer versions. Ever persistent, Ponzo faults the court for applying a criminal-livelihood enhancement for Group 3. The court agreed that this enhancement was not around when the relevant crimes occurred "and, therefore, . . . would not be applied." But the court added it could "apply a three-level" enhancement under the older guidelines based on Ponzo's "role as a manager or supervisor" in the marijuana conspiracy -- an increase that would help keep the guidelines range the same under either the older or newer versions of the manual. Ponzo briefly argues against that enhancement, saying the evidence below showed that Steven Stoico was "the boss" -- to hear Ponzo tell it, he (Ponzo) simply "shipped the marijuana." But even if Stoico was the boss, making him eligible for a four-level enhancement for being a leader, Ponzo could still get a three-level manager or supervisor enhancement. See U.S.S.G. § 3B1.1(a), (b). And the evidence supported the enhancement because Ponzo trained and paid a guy for packing marijuana. See United States v. Garcia-Hernandez, 659 F.3d 108, 114 (1st Cir. 2011) (holding that the aggravating role adjustment found in § 3B1.1(b) requires

the sentencer to find, first, that "the underlying criminal activity involved more than five participants or was otherwise extensive," and, second, that the defendant managed or supervised one or more of the other participants in that activity").

No reversible error happened here.

B. *Criminal History*

Ponzo says the court erred by assessing criminal-history points under the guidelines for convictions listed in paragraphs 160-63 of the probation service's presentence report (like the parties, we will use these paragraph numbers to refer to the targeted convictions). First he argues (as he did in the district court) that two convictions -- found in ¶¶ 160 and 163 -- should not have been counted because they were not supported by "official court records." Reviewing this matter *de novo*, we reject his claim. The conviction in ¶ 163 *was* based on official court records, despite what Ponzo says. As for the conviction in ¶ 160, the probation officer noted she had not "yet" received "official court documentation." When a defendant contests "a presentence report's description of an alleged prior conviction," the government must show "that the description in the report is based on a sufficiently reliable source." United States v. Brown, 510 F.3d 57, 75 (1st Cir. 2007) (quotations omitted). And where the presentence report cites solely "non-judicial records," the court

must conduct "additional inquiry into the reliability of these sources." United States v. Bryant, 571 F.3d 147, 155 (1st Cir. 2009). The government here attached police records to its sentencing memo that corroborated the information in ¶ 160 -- which, as the government notes (without being contradicted by Ponzo) established the information's reliability.

Leaving no stone unturned, Ponzo claims he should have gotten no criminal-history points for the conviction in ¶ 160 since probation "could not verify" whether he had legal counsel in that case -- an unpreserved contention limited to plain-error review. Because "the government establish[ed]" the conviction's "existence, the burden shift[ed]" to him "to show that the earlier conviction was constitutionally infirm or otherwise inappropriate for consideration." See United States v. Barbour, 393 F.3d 82, 93 (1st Cir. 2004). Ponzo does not try to make either showing, however. And even if we accept *arguendo* that he was uncounseled, he has not shown that he did not waive his right to counsel. See id. Thus once again he comes up short on the plain-error front.

As a final effort to chip away some criminal-history points, Ponzo says (as he did below) that the convictions in ¶¶ 161-63 took place "after the commencement of the instant offense" and so are "not prior convictions" for purposes of computing criminal history. Approaching this issue *de novo*, we

see that the guidelines say "[a] sentence imposed after the defendant's commencement of the instant offense, *but prior to sentencing on the instant offense*, is a prior sentence if it was for conduct other than conduct that was part of the instant offense." U.S.S.G. § 4A1.2 cmt. n.1 (emphasis added). "Conduct that is part of the instant offense," the guidelines add, "means conduct that is relevant conduct to the instant offense," id. -- i.e., conduct that is "within the scope of" and "in furtherance of" the criminal activity and was "reasonably foreseeable in connection with that criminal activity," see U.S.S.G. § 1B1.3(a)(1)(B). Ponzo began his participation in the racketeering conspiracy before he was sentenced on the offenses in ¶¶ 161-63. But critically for our purposes, at the time of sentencing in this case, he had already been sentenced for the offenses in ¶¶ 161-63. And nothing leads us to believe -- nor does Ponzo persuasively argue -- that these convictions constituted relevant conduct to this case.

No reversible error occurred here.

C.    *Career-Offender Designation*

Ponzo believes the district court wrongly classified him as a career offender under U.S.S.G. § 4B1.1. But we need not delve into that issue. And that is because -- as the government says, and as the court itself noted -- the career-offender designation

made no difference to his guidelines range:  even without it, Ponzo still faced a guidelines range of 360 months to life.  And that makes any error (if there was one) harmless.[17]  See United States v. Battle, 637 F.3d 44, 50 (1st Cir. 2011).

We have no reason to reverse here, either.

## XV.    Forfeiture

The district court ordered Ponzo to forfeit $2.25 million.  And Ponzo assigns five errors with that award.  The government sees no problems, we should add.  For properly preserved claims, we review pure "questions of law de novo, but, to the extent factual issues are intermingled, consider mixed questions of law and fact under the more deferential clear error standard."  See United States v. Ferrario-Pozzi, 368 F.3d 5, 8 (1st Cir. 2004); see also United States v. Jose, 499 F.3d 105, 108 (1st Cir. 2007) (explaining that when a defendant claims a forfeiture is constitutionally excessive, "[o]ur review is de novo," with "deference" given "to the district court's factual findings" under

---

[17] To the extent Ponzo separately suggests that the court erred in applying a consecutive sentence under § 4B1.1(c) for violating § 924(c) -- his brief hints that the court could not use § 4B1.1(c) because that subsection "was enacted" after the completion of the conduct underlying the § 924(c) count -- we say this (in addition to the point we made above):  even before subsection (c) became part of the career-offender guidelines, the guidelines made clear that § 924(c)'s mandatory-minimum sentence was to be applied "consecutively to any other term of imprisonment."  See U.S.S.G. § 2K2.4 cmt n.1 (1993).

the clear-error standard).  We review unpreserved issues for plain error.  See, e.g., Jose, 499 F.3d at 108.  Readers should consider an issue preserved (either because it is preserved or because it is easier for us to assume it is preserved), unless told otherwise.

Ponzo opens up by claiming (without citation to any authority) that the judge should have limited the forfeiture to the amount sought in the superseding indictment -- an unpreserved claim of error.  The superseding indictment told Ponzo that the government sought the "proceeds" of the drug-trafficking crime, "including but not limited to" a "$1.5 million" judgment.  Rule 32(a) of the Federal Rules of Criminal Procedure provides that the forfeiture notice in an indictment "need not . . . specify the amount of any forfeiture money judgment that the government seeks," see Fed. R. Crim. P. 32(a) -- it logically follows that a forfeiture determination need not flow from the indictment, or so says the government.  Putting aside this theory, we think what dooms Ponzo's claim is that he has not shown that this alleged error was plain under controlling precedent -- which means this challenge flunks plain-error review.  See, e.g., Morosco, 822 F.3d at 21.

Ponzo next claims the court erred by determining the forfeiture amount instead of the jury.  But that argument has no traction either.  The criminal rules provide that either party may

- 63 -

request "that the jury be retained to determine the forfeitability of specific property." Fed. R. Crim. P. 32.2(b)(5)(A). But the rules say nothing about the jury determining the forfeiture amount. Instead the rules declare that "[i]f the government seeks a personal money judgment, the *court* must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A) (emphasis added); cf. generally United States v. Misla-Aldarondo, 478 F.3d 52, 75 (1st Cir. 2007) (reviewing a judge-determined forfeiture amount). And today we follow our sibling circuits in holding that the criminal rules "do[] not require a jury determination in the form of a personal money judgment." United States v. Christensen, 828 F.3d 763, 822 (9th Cir. 2015); see also United States v. Jameel, 626 F. App'x 415, 419 (4th Cir. 2015) (per curiam); United States v. Curbelo, 726 F.3d 1260, 1277 (11th Cir. 2013); United States v. Grose, 461 F. App'x 786, 806 (10th Cir. 2012); United States v. Gregoire, 638 F.3d 962, 972 (8th Cir. 2011).

Shifting gears, Ponzo also claims the court botched matters by not limiting "[t]he money judgment . . . to the amount that [he] actually received for his role in shipping the marijuana, or at most the profits from the conspiracy." His suggestion that the forfeiture amount should not include funds received by his co-conspirators runs headlong into caselaw establishing that "[s]o

- 64 -

long as the amount handled by others is foreseeable as to a defendant, the foreseeable amount represents the sounder measure of liability."  See United States v. Hurley, 63 F.3d 1, 22 (1st Cir. 1995).[18]

Next, quoting 21 U.S.C. § 853(a) -- which says "[i]n lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds" and which he agrees he "was subject to" -- Ponzo claims "other proceeds" means

---

[18] Hurley dealt with a RICO forfeiture provision in § 1963(a), rather than the drug-related forfeiture provision in § 853(a). See 63 F.3d at 22.  But the two provisions are similarly worded. Compare § 1963(a)(3) (calling for the forfeiture of "any property . . . derived from . . . any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection"), with § 853(a)(1) (calling for the forfeiture of "any property . . . derived from . . . any proceeds the person obtained, directly or indirectly, as the result of such violation" of the drug laws).  That similarity in wording reflects the fact that Congress -- as the legislative history of § 853 demonstrates -- intended these provisions to "closely parallel" one another. United States v. White, 116 F.3d 948, 950 (1st Cir. 1997).  And so we -- like other courts -- construe them similarly, as White directs, a case Ponzo does not address.

After oral argument here, the Supreme Court granted certiorari in a Sixth Circuit case presenting the issue of whether § 853(a)(1) mandates joint and several liability among co-conspirators for forfeiture of the reasonably foreseeable proceeds of a drug conspiracy. See United States v. Honeycutt, 816 F.3d 362 (6th Cir), cert. granted, 137 S. Ct. 588 (2016) (oral argument Mar. 29, 2017).  We forge ahead, however, as we have done in similar situations. See, e.g., Yaman v. Yaman, 730 F.3d 1, 4 (1st Cir. 2013); United States v. Volungus, 595 F.3d 1, 4 (1st Cir. 2010).

- 65 -

"net profits," not "gross proceeds." But we rejected that very argument in United States v. Bucci, which held that a district court did not plainly err by instructing a jury that "proceeds" in § 853(a) means the "gross proceeds" of drug trafficking, not "net profits." See 582 F.3d 108, 121-24 (1st Cir. 2009). True, Bucci analyzed the issue in terms of plain error. Id. But Bucci made clear that there was no error at all. See id.

Pulling out all the stops, Ponzo claims the money judgment violated the Eighth Amendment's excessive-fines clause because (in his view) it will deprive him of the ability to make a living. See United States v. Sepúlveda-Hernández, 752 F.3d 22, 37 (1st Cir. 2014) ("[a]ssuming, without deciding, that deprivation of livelihood can constitute a basis for setting aside a criminal forfeiture judgment"); United States v. Aguasvivas-Castillo, 668 F.3d 7, 16 (1st Cir. 2012) (holding that a defendant "may raise whether the forfeiture order is so excessive under the Eighth Amendment that it would, in extreme cases, effectively deprive the defendant of his or her future livelihood"). But as the government points out, "the Attorney General and the Secretary of the Treasury may remit a forfeiture on the grounds of hardship to [Ponzo] under 21 U.S.C. §§ 853(j), 881(d), and 19 U.S.C. § 1618," if appropriate. See Aguasvivas-Castillo, 688 F.3d at 16. And as the district court pointed out, "the value of the specific

- 66 -

assets found forfeitable" will reduce "the money judgment" -- so Ponzo "will not be required to earn and re-pay the full" $2.25 million.  The end result is that Ponzo has not met his "burden to establish a record at the district court level that could sustain a deprivation of livelihood claim."  See Sepúlveda-Hernández, 752 F.3d at 37.

Ponzo also takes the district court to task for issuing a September 25, 2015 restraining order on his prison commissary account without a hearing.[19]  He says that § 853(e)(2) required the court to hold a hearing since he asked for one -- this even though § 853(e)(2) applies only to temporary restraining orders issued "when an information or indictment has not yet been filed" and the restraining order here came after the indictment.  But we need not deal with his argument because -- as the government is quick to note -- his *pro se* notice of appeal from the court's order is untimely.  Ponzo dated the notice October 9, exactly 14 days after the district court entered the order.  See generally Fed. R. App. P. 4(b)(1)(A)(i) (giving a criminal defendant 14 days to file a notice of appeal).  But the notice was not docketed until October 19, 10 days after the due date.  See generally United States v. Gonzalez-Rodriguez, 777 F.3d 37, 40 n.4 (1st Cir. 2015) (explaining

---

[19] All dates here are in that year.

that "[w]e need to decide" whether Rule 4(b)'s time limits are jurisdictional "because the time limits, even if not jurisdictional, are mandatory when raised by the government"). And Ponzo -- represented by counsel on appeal -- does nothing to establish the timeliness of his notice under the prisoner-mailbox rule. <u>See</u> Fed. R. App. P. 4(c)(1). Enough said about the restraining-order issue.

## CONCLUSION

Here is what this all means: We *dismiss* the appeal from the restraining order (No. 15-2277) as untimely and *affirm* the judgments in the other appeals (Nos. 14-1528, 14-1548, 14-1906, and 15-1878).