# United States Court of Appeals
## For the First Circuit

No. 11-2195

UNITED STATES OF AMERICA,

Appellee,

v.

ROLDY FRANCOIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Howard, Ripple,[*] and Lipez,
Circuit Judges.

Michelle Menken, with whom Kerry Haberlin was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief for appellee.

April 22, 2013

---

[*]Of the Seventh Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  Following a three-day trial, a jury convicted defendant-appellant Roldy Francois ("Francois") on four counts of possessing firearms as a convicted felon, one count of possessing a firearm with an obliterated serial number, and twelve  counts stemming from his use of a stolen identity to purchase those firearms.  Following his conviction, the district court sentenced Francois to a term of 164 months.  Francois appeals, asserting that the district court (1) abused its discretion when it denied his motion for a third court-appointed attorney; (2) failed to adequately warn him about the consequences of proceeding pro se; (3) erred in instructing the jury on the use of flight evidence; (4) abused its discretion in failing to conduct an evidentiary hearing on his motion to suppress. Francois also claims that his sentences on counts 10-13 exceed the statutory maximum.

For the reasons explained below, we affirm Francois's conviction.  The government agrees, correctly, that the sentences on counts 10-13 do exceed the statutory maximum.  Hence, we remand for resentencing.

## I.  Background

In reviewing Francois's conviction, we consider the facts established at trial in the light most favorable to the jury's verdict.  United States v. Gómez-Rosario, 418 F.3d 90, 93 (1st Cir. 2005).

## A. Facts

On March 27, 2009, a young government employee named Efrain Baez reported that a briefcase containing his social security card and birth certificate had been stolen. For more than a year, Baez knew nothing about the fate of his stolen documents. Unbeknownst to Baez, less than a month after his documents were stolen, his identity would be appropriated by Roldy Francois, a convicted felon living in Rhode Island.

On April 23, 2009, the state of Florida issued Francois a driver's license in Baez's name but bearing a picture of Francois. Francois proceeded to use Baez's identity on at least four occasions to purchase guns from Dave's Guns, a firearms dealer in Rhode Island. When purchasing each of these firearms, Francois identified himself as "Efrain Baez" on ATF Form 4473 and certified that he had never been convicted of a felony.[1] Evidence in the record indicates that Francois also identified himself as Efrain Baez when he was cited for speeding, that he used Baez's identity

---

[1] ATF Form 4473, or a "Firearms Transfer Record," is a form filled out in the course of an over-the-counter purchase of a firearm. The form requires the purchaser to provide identity information and allows the dealer to initiate a National Instant Criminal Background Check System search. The Gun Control Act of 1968, 18 U.S.C. §§ 921-930, requires gun dealers to keep records of the information collected by means of ATF Form 4473 for 20 years and make them available for inspection to ATF agents upon request. See United States v. Lewis, 517 F.3d 20, 22 n.1 (1st Cir. 2008); Borchart Rifle Corp. v. Cook, 684 F.3d 1037, 1039 (10th Cir. 2012).

at a firing range, and that he assumed Baez's identity in some social situations.

Francois continued to use Baez's identity with impunity until early 2010, when an ill-fated attempt to dupe the police put an end to his charade. In February 2010, two of the guns Francois had illegally purchased at Dave's Guns were stolen from his car. On February 16, 2010, Francois went to the Providence Police Department accompanied by his girlfriend and his private attorney to report the theft. When he arrived at the station, Francois identified himself as "Efrain Baez."

Unfortunately for Francois, the detective assigned to take his report had encountered Francois in the course of Francois's previous criminal activities. Detective Maurice Green ("Detective Green") testified at trial that he recognized Francois "as soon as he walked in the door," but could not immediately place him. Green also thought it was "odd" that someone would bring an attorney with him to the station to report a crime, and his suspicions were further aroused because "there was something very wrong with [Francois's] entire story." Nevertheless, Green took Francois's report, and Francois left the station without incident.

Convinced that he had encountered Francois before, Detective Green reviewed his old case files and discovered that the man who had identified himself as Efrain Baez was, in fact, Roldy Francois. With this information, Detective Green immediately

contacted Immigration and Customs Enforcement ("ICE") and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").

Law enforcement agents initially attempted to apprehend Francois at 148 Hudson Street in Providence, the address Francois had given Detective Green during their February 16 interview. Upon arrival at that address, however, the police were told by Francois's girlfriend that he had moved and left no forwarding address. After this initial setback, law enforcement officers were unable to locate Francois for several weeks until they received a tip that Francois was residing at 44 Taylor Street in Providence.

Early in the morning of March 16, 2010, a team of fully armed and uniformed Providence police officers, ATF agents, and United States Marshals approached the three-story apartment building at 44 Taylor Street. The Marshals knocked on the exterior door, identified themselves as law enforcement officers, and told the residents who answered that they were there to arrest Francois. When Deputy Officer Brian McDonald ("Officer McDonald") showed the residents a photograph of Francois, one resident pointed his finger toward the ceiling and mouthed the word "up."

Taking this to mean Francois was upstairs, Officer McDonald proceeded to the third floor, where he observed an opening in the ceiling, which revealed a small, unfinished attic. Suspecting that Francois was hiding in the attic, Officer McDonald identified himself as a U.S. Marshal and announced that he had a

warrant for the arrest of Roldy Francois, also known as Efrain Baez. In response, Francois moved toward the opening, allowing Officer McDonald to confirm visually that the man in the attic was indeed Francois. Officer McDonald observed Francois lying prone in the attic clutching a dark, semi-automatic handgun to his chest. At that point, Francois announced "that he was not going to jail, that he was in possession of a gun and no attempts should be made to remove him from the attic."

Officer McDonald quickly alerted his fellow law enforcement agents that Francios was armed, and called for a back-up Special Weapons and Tactics ("SWAT") team. A tense, six-hour stand-off between Francois and law enforcement ensued. Several times during the stand-off, Francois threatened to shoot either one of the officers or himself. Finally, late in the afternoon, Francois surrendered peacefully and was taken into custody.

## B. Pre-Trial Proceedings

A federal grand jury returned a seventeen-count indictment, charging Francois with four counts of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), one count of being in possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B), four counts of making false statements in the purchase of firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), four counts of possession of an identity document with

-6-

intent to defraud the United States in violation of 18 U.S.C. §§ 1028(a)(4) and (b)(1), and four counts of using an identification document with intent to defraud the United States in violation of 18 U.S.C. §§ 1028A(a)(1).

From the outset, Francois's relationships with his court appointed attorneys were acrimonious. The court initially appointed Attorney Mary June Ciresi ("Ciresi") to represent Francois, but relations between the two deteriorated quickly. After only a few weeks of representation, Francois filed a complaint against Ciresi with the disciplinary committee of the Rhode Island bar, and Ciresi moved to withdraw. After a hearing, the district court granted the motion to withdraw, and appointed Francois a second attorney, William Dimitri ("Dimitri").

Equally unimpressed with Dimitri, Francois asked the court in August to appoint him yet a third attorney. At the hearing on his motion for new appointed counsel, Francois stated that he and Dimitri were having "a problem of communication." Francois explained further that "[t]his is my first time in the federal system. I'm not quite understanding properly the whole scenario of the sentencing guidelines." Francois also accused Dimitri of focusing exclusively on "the worst case scenario."

The district court disagreed with Francois's characterization of his relationship with Dimitri. In rejecting

Francois's motion for a third appointed counsel, the court reasoned:

> I don't see any substantive disagreement here. It just seems to me like he's giving you advice, it's been pretty good advice, and you haven't really liked the advice . . . I get the sense you think somebody else is going to give you different advice or file different things for you. I just don't think that's going to happen.

Two months later, Francois again moved to terminate his relationship with Dimitri. In support of this motion, Francois sent the court a letter addressed to Dimitri in which Francois stated:

> I [] feel like you are losing faith in this case perhaps because you can't win this case. . . . You are proceeding to handle my case as one that will end up as a guilty plea. . . . You refuse to put in motions for anything. . . . You refuse to accept my calls. . . . [Y]ou are taking me as another body to be delivered to the federal system. . . . [A]s of now you are fired.

At the October hearing on this second motion, Dimitri told the court that Francois "want[ed] to kill the messenger" rather than accept the truth of his circumstances. Dimitri asserted that he had met with Francois at least four times, taken many phone calls from Francois and his wife, and conducted research on the motions that Francois had asked him to file to confirm his initial suspicion that they had no merit. The district court again concluded that Francois was not entitled to a third court-appointed attorney, explaining that "Mr. Dimitri is one of the most able

-8-

criminal defense attorneys in the State of Rhode Island . . . You don't like what [Dimitri's] opinion indicates.  But that's not a compelling reason for me to grant your motion to change counsel."

Nevertheless, Francois continued to voice his dissatisfaction with Dimitri and continued his attempts to file pro se motions with the court.  Shortly before jury impanelment, Francois urged the court to allow him to proceed pro se.  After informing Francois that he had a right to represent himself, the court told Francois that:

> I have an obligation to tell you that I think that is a terrible idea, and I think you would be making a catastrophic mistake to -- by representing yourself in this trial. But I can't stop you from doing it.  All I can do is tell you that I think it would be a very bad idea, and it would be very detrimental to your interests in receiving a fair trial in this case. . . . One way or the other we're going to impanel the jury here this afternoon.

After reiterating that it would be a "very bad decision" for Francois to represent himself, the court acquiesced to Francois proceeding pro se and appointed Dimitri to act as standby counsel. The court advised Francois that he could inform the court at any moment of his wish to revoke his waiver, and Dimitri would step in as his attorney.  The court also cautioned Francois that he would receive no extensions of time, and that he would need to be prepared for trial 20 days hence.

Francois filed several pre-trial motions pro se, including a motion to suppress the statements he made to Detective

Green during their interview at the Providence Police Station on February 16, 2010, in which Francois had identified himself falsely as Efrain Baez. Francois argued that the statements he made to Detective Green should be suppressed on a theory that the interview was a custodial interrogation requiring a <u>Miranda</u> warning. After a hearing, the district court denied both Francois's motion to suppress these statements and his further request for an evidentiary hearing to determine whether or not he was objectively reasonable in feeling he was not free to leave the interview.

## C. Trial

At trial, Francois initially appeared pro se, delivering his own opening statement and making objections to the government's direct examination of its first witness. In fact, one of Francois's three objections to this witness's testimony was sustained. After beginning his cross-examination of the witness, however, Francois decided that he could no longer continue to represent himself and accepted representation by Dimitri. Dimitri then stepped in and represented Francois for the rest of the proceeding. At a later point in the trial, Francois asked the court if he could once again proceed pro se, but the court denied that motion.

Before the jury began its deliberations, and over the objection of Francois, the district court provided the jury with the following instruction on how to use evidence of flight:

Now, intentional flight by a defendant after he is accused of a crime for which he is now on trial may be considered by you in light of all the other evidence in the case. The burden is upon the Government to prove intentional flight. Intentional flight after the defendant is accused of a crime is not alone sufficient to conclude that he is guilty. Flight does not create a presumption of guilt. At most, it may provide the basis for an inference of consciousness of guilt. But flight may not always reflect feelings of guilt. Moreover, feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt. In your consideration of the evidence of flight, you should consider that there may be reasons for the Defendant's actions that are fully consistent with innocence. It is up to you as members of the jury to determine whether or not evidence of the intentional flight shows a consciousness of guilt and the weight or significance to be attached to any such evidence.

The jury returned a verdict convicting Francois on all seventeen counts of the indictment. Following his conviction, the district court sentenced Francois to a total of 164 months imprisonment.

## II. Francois's Sixth Amendment Claims

Francois advances two interrelated Sixth Amendment claims. First, Francois argues that his Sixth Amendment right to effective assistance of counsel was violated when the court denied his motion for new appointed counsel and thereby forced Francois into what he characterizes as a "Hobson's Choice" between proceeding with ineffective counsel or proceeding pro se. Second, Francois argues that his decision to waive his right to counsel was not intelligent because the court failed to warn him about the

-11-

consequences of proceeding pro se as required by the Supreme Court's opinion in <u>Faretta</u> v. <u>California</u>, 422 U.S. 806 (1975).

**A. Francois's Motion for New Appointed Counsel**

Though the right to counsel is fundamental, the right of an indigent criminal defendant to demand new appointed counsel is not unlimited. "[I]n appropriate circumstances, a trial court may force a defendant to choose between proceeding to trial with an unwanted attorney and representing himself." <u>United States</u> v. <u>Proctor</u>, 166 F.3d 396, 402 (1st Cir. 1999). In reviewing whether it was appropriate for the trial court to impose that choice, we rely on the three factors laid out in <u>United States</u> v. <u>Allen</u>, 789 F.2d 90, 92 (1st Cir. 1986): "(1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense." <u>United States</u> v. <u>Hicks</u>, 531 F.3d 49, 54-55 (1st Cir. 2008). Our review is for abuse of discretion. <u>United States</u> v. <u>Meyers</u>, 294 F.3d 203, 207 (1st Cir. 2002).

Because Francois's motions for new appointed counsel were all timely, we begin with the second prong of the <u>Allen</u> analysis -- the adequacy of the inquiry into Francois's complaints about Dimitri. The court conducted two pre-trial hearings on Francois's motions for new appointed counsel and issued a separate written

-12-

ruling following each hearing[2].  In each hearing and in each order, the district court carefully examined Francois's complaints and concluded that the source of Francois's disappointment with Dimitri was not any lack of competence on Dimitri's part, but rather was Francois's refusal to accept Dimitri's accurate assessment of Francois's predicament.  The district court's inquiry was more than adequate.  Indeed, the district court endured Francois's repeated complaints with commendable patience.

Moving to the third prong of the Allen inquiry, we assess whether there is evidence on the record that the attorney-client relationship had so deteriorated that there existed a "total lack of communication preventing an adequate defense." Allen, 789 F.2d at 92.  The pre-trial hearing transcripts leave little doubt that Francois did not like Dimitri's legal opinions or tactics.  There is no evidence, however, that the parties were not communicating with each other or that Dimitri was in any way neglecting his responsibilities.  In fact, at the January 2011 hearing, both parties made it clear that they had been communicating regularly.  Dimitri told the court that he had already met with Francois in person "a minimum of nine to ten times" in addition to many phone conversations.  Francois estimated that they had met "four times" in person and described several phone conversations.  Indeed,

---

[2] The court also conducted a hearing on Francois's motion to replace his first appointed counsel, Ciresi.

-13-

Francois's litany of complaints about Dimitri all belie the fact that the pair were in frequent communication during the pre-trial period.

Francois simply did not like what he was hearing during those communications. Specifically, he did not like hearing that the motions he wanted Dimitri to file were frivolous; that he would almost certainly be convicted and should accept a plea bargain; and that the "worst case scenario" sentence he could receive if convicted would be severe. In other words, Francois's complaints reflect his disdain for Dimitri's advice, but none of Francois's complaints indicate that the two were so unable to communicate that Dimitri could not present an "adequate defense" on Francois's behalf. See United States v. Pierce, 60 F.3d 886, 891 (1st Cir. 1995) (finding no irreversible breakdown where defendant and attorney had "some appreciation for the other's opinions and sensibilities"); United States v. Machor, 879 F.2d 945, 952 (1st Cir. 1989) (noting that in reviewing the third prong of the Allen analysis, "one should bear in mind that the right to counsel does not involve the right to a 'meaningful relationship' between an accused and his counsel") (quoting Morris v. Slappy, 461 U.S. 1, 14 (1983)).

For these reasons, we conclude that the district court did not abuse its discretion in denying Francois's motions to replace Dimitri with new appointed counsel.

-14-

## B.  Francois's Waiver Of His Right to Counsel

"Because of the disadvantages to a defendant that inure from pro se representation, a defendant must 'knowingly and intelligently' waive his right to counsel before he may be permitted to proceed pro se." United States v. Kneeland, 148 F.3d 6, 11 (1st Cir. 1998) (quoting Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938)).  As such, when a defendant seeks to proceed pro se, the trial judge must determine whether the defendant's waiver is "intelligent and competent." Proctor, 166 F.3d at 402.  In discharging this responsibility, the trial judge must keep in mind the strong presumption against waiver and "'investigate as long and as thoroughly as the circumstances of the case before him demand.'" Id. (quoting Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948)). As part of the inquiry into whether the defendant's waiver is intelligent, the trial judge must warn the defendant "of the dangers and disadvantages of self-representation, so that the record will establish that '[the defendant] knows what he is doing and his choice is made with eyes open.'"Id. at 401 (quoting Faretta, 422 U.S. at 835); see also Maynard v. Meachum, 545 F.2d 273, 279 (1st Cir. 1976) ("[T]he accused should have a general appreciation of the seriousness of the charge and of the penalties

he may be exposed to before deciding to take a chance on his own skill.").[3]

Francois alleges that his decision to proceed pro se was not made "intelligently" because the court failed to adequately warn him of the dangers of proceeding pro se. Indeed, the government conceded at oral argument that "ideally" the court would have been more detailed in its warning. Although the court did tell Francois that self-representation would be a "terrible idea" and a "catastrophic mistake," the court did not go beyond these dire generalizations to give a specific example of the consequences of self-representation that might enhance a layman's understanding of the significance of the decision to proceed without counsel. For example, the court did not explain that the defendant might have defenses that only a lawyer would appreciate. Phrases like "catastrophic mistake" do not convey in concrete terms the sentencing range Francois would likely face if he were convicted, and the judge did not explain that he could not give advice or guidance during the trial.

Francois's argument fails to appreciate, however, that even where the court's <u>Faretta</u> warning is less thorough than it might be, we may nevertheless affirm a district court's decision to allow a defendant to proceed pro se if "the record amply supports

---

[3] This warning is sometimes called a "<u>Faretta</u> warning" or a "<u>Faretta</u> inquiry" after the Supreme Court's opinion in <u>Faretta</u> v. <u>California</u>, 422 U.S. 806 (1975).

the lower court's conclusion that [the defendant] was fully aware of the disadvantages he would face as a pro se defendant." Kneeland, 148 F.3d at 12 (considering defendant's background as a disbarred attorney and his conduct at trial in affirming that defendant's waiver of his right to counsel was intelligently made); see also United States v. LaBare, 191 F.3d 60, 68 (1st Cir. 1999) (considering defendant's experience as a defendant in previous criminal trials as a factor indicating his decision to proceed pro se was intelligently made); Maynard, 545 F.2d at 277 (determining that "the absence of explicit bench warnings or a colloquy on the record" does not compel a conclusion that defendant's waiver was invalid).

We are satisfied on this record that Francois understood the trial process and was fully aware of the gravity of the charges facing him. Throughout the lengthy pre-trial proceedings, Francois was actively involved in preparing for his own defense. At the various hearings on his many pre-trial motions, the court engaged in several lengthy discussions with Francois. During each of these discussions, Francois was lucid, articulate, and engaged. Moreover, the arguments Francois made on his own behalf demonstrate that he had conducted extensive legal research of his own accord and was fully aware of the nature of the charges against him.

Furthermore, while the court did not explicitly advise Francois of the consequences he would face if convicted, Francois

cannot claim that he was ignorant of the potential punishment he faced. The record of the pre-trial proceedings clearly shows that Francois received advice regarding potential sentences from Dimitri. Indeed, Francois's distress at Dimitri's assessment of the "worst case scenario" seems to have been a significant source of his dissatisfaction with Dimitri. Moreover, the court did explain to Francois that the federal sentencing calculations were complicated and reiterated several times to Francois that it was critical that he give careful consideration to his attorney's assessment of the possible sentences he could face, rather than merely attacking his attorney for being the messenger of bad news.

For these reasons, we conclude that Francois's waiver of his right to counsel was "intelligent and knowing" and the district court did not err in allowing him to proceed pro se.

### III.  Francois's Additional Challenges to His Conviction

Francois advances two additional arguments: that the district court abused its discretion in giving the jury a consciousness-of-flight instruction, and that the district court abused its discretion in denying an evidentiary hearing on Francois's pro se motion to suppress the statements he made to Detective Green in their initial encounter at the police station. We consider these arguments in turn.

## A. Flight Instruction

"Given an adequate factual predicate . . . evidence of a criminal defendant's flight is generally thought to be probative of his or her consciousness of guilt." United States v. Benedetti, 433 F.3d 111, 116 (1st Cir. 2005). Where such an "adequate factual predicate exists," the district court may instruct the jury that evidence of flight may indicate a defendant's consciousness of guilt. See United States v. Camilo Montoya, 917 F.2d 680, 683 (1st Cir. 1990); United States v. Hyson, 721 F.2d 856, 864-65 (1st Cir. 1983). Our review of the trial court's decision to do so is deferential, and "[a] district court is afforded considerable leeway when determining whether evidence of a defendant's flight is accompanied by a sufficient factual predicate." Bendetti, 433 F.3d at 116.

Francois's claim that there was an inadequate factual predicate for the flight instruction borders on the frivolous. The government presented an abundance of evidence supporting the inference that Francois fled to the attic because he was conscious of his own guilt. On the day of his arrest, Francois knew that the police were looking for him because -- by his own admission -- he knew that Detective Green had recognized him when he used a stolen identity to report the theft of his illegally purchased guns. Within days of his interview with Detective Green, Francois had packed his belongings and left the apartment where he had been

living with no forwarding address. When a fully uniformed and armed team of officers finally found Francois at 44 Park Street and announced their intent to arrest him, the Marshals discovered him lying prone with a semi-automatic handgun in a small, unfinished attic that was accessible only by standing on a chair and hoisting oneself through a hole in the ceiling. Such efforts at concealment and evasion are tantamount to flight for the purpose of consciousness-of-guilt instructions. See United States v. Meadows, 571 F.3d 131, 146 (1st Cir. 2009) (upholding admission of defendant's flight attempt during a traffic stop because "the fact that [defendant]'s flight was neither successful nor lengthy is immaterial to the fact that he chose to flee"); see also United States v. Wright, 392 F.3d 1269, 1277 (11th Cir. 2004) ("[E]vidence of resisting arrest is probative of [the defendant]'s consciousness of guilt."); United States v. Pallais, 921 F.2d 684, 689-90 (7th Cir. 1990) (finding testimony indicating that when police sought to arrest defendant in his home he hid from them in a crawlspace was admissible to show consciousness of guilt).

## B. The Court's Denial of an Evidentiary Hearing on Francois's Motion to Suppress

Francois's argument that the court should have conducted an evidentiary hearing on his motion to suppress is similarly hopeless. "A criminal defendant does not have a presumptive right to an evidentiary hearing on a motion to suppress." United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011). Rather, "[a] hearing

is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record.  Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996) (citations omitted).  Our review is for abuse of discretion. United States v. Farlow, 681 F.3d 15, 18 (1st Cir. 2012).

Arguing that he should have been granted an evidentiary hearing on his motion to suppress the statements he made to Detective Green during their February 16 interview, Francois claims that there was a factual dispute over whether Detective Green separated Francois and his girlfriend at some point during their interview.[4]  Under Francois's theory, resolving this factual dispute in his favor would compel the court to conclude that he was objectively reasonable in believing he was not free to end his interview with Detective Green and thus was in custody for Miranda purposes.  See Stansbury v. California, 511 U.S. 318, 323 (1994) (whether or not custody exists for Miranda purposes "depends on the objective circumstances of the interrogation, not on the subjective

_____

[4]In his brief, Francois claims that the government also disputes the fact that Detective Green spoke to his attorney in the hallway while Francois remained in the interview room. As the government assented to this fact during the suppression hearing and assents to it again on appeal, it is not actually in dispute. Even if it were it is not material on the facts of this case.

-21-

views harbored by either the interrogating officers or the person being questioned").

Unfortunately for Francois, his argument is a non-starter. Even if this factual dispute were resolved in his favor, he would still have been objectively unreasonable in believing he was in custody. Francois came to the police station on February 16 of his own volition to report that he was the victim of a crime. He was not physically restrained nor told that he was not free to leave. See United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012) ("[W]hether an individual is in Miranda custody depends on whether there is a 'restraint on freedom of movement of the degree associated with a formal arrest.'" (quoting Maryland v. Shatzer, 130 S.Ct. 1213, 1224 (2010))). He was never questioned without his attorney present, and he was never yelled at, threatened, or badgered. See United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2004) (noting that the fact that "[n]o one screamed at [defendant], badgered him for answers, or menaced him in any way" indicated that interaction was not a custodial interrogation). At the conclusion of the interview, Francois casually left the police station a free man. In sum, this scenario does not even come close to the type of custodial interrogation that we have found to require a Miranda warning. Adding a private interview between Detective Green and Francois's girlfriend to the mix does not change that outcome.

The district court did not abuse its discretion in declining to grant an evidentiary hearing on his motion to suppress.

## IV. Sentencing

Francois argues and the government concedes that his sentence on Counts 10-13 of the indictment was plainly erroneous because the court used facts not found by the jury to impose a sentence greater than the one-year statutory maximum provided in 18 U.S.C. § 1028(b)(6). See Cunningham v. California, 549 U.S. 270, 274-75 (2007) ("[T]he Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact . . . not found by a jury or admitted by the defendant.").

For his convictions on Counts 10-13, the court sentenced Francois to 140 months under 18 U.S.C. § 1028(b)(1), which requires both a conviction under 18 U.S.C. § 1028(a) and a jury finding that the violation involved the "production or transfer" of a false identity document.[5] But in this case, both the indictment and the jury instructions asked the jury to determine only whether Francois had "possessed" a false identity document with intent to defraud,

---

[5] Counts 10-13 of the indictment charged Francois with violating 18 U.S.C. § 1028(a)(4), which provides that anyone "knowingly possess[ing] an identification document . . . or a false identification document, with the intent such document or feature be used to defraud the United States . . . shall be punished as provided in subsection b of this section."

-23-

not whether he had produced or transferred that identity document. As such, we agree with the parties that imposing an enhanced sentence under Section 1028(b)(1) was error. The statutory maximum for these counts should have been the one-year statutory maximum provided in Section 1028(b)(6), a catchall which applies to violations of 18 U.S.C. § 1028(a)(4) where the jury makes no additional findings that special circumstances were present.

The consequences of this error are significant. A brief review of the "sentencing architecture" of Francois's sentence demonstrates why vacating the sentence on Counts 10-13 will undermine the entire sentencing structure crafted by the district court. Francois was sentenced to concurrent sentences of 140 months each on Counts 10-13, 120 months each on Counts 1-4 and 6-9, and 60 months on Count 5. He was also sentenced to 24 months each on Counts 14-17, to run concurrently with each other but consecutively with his sentences on Counts 1-13. In other words, his sentence on Counts 14-17 required him to serve 24 months on top of the longest term imposed for Counts 1-13 -- which was the 140 months for Counts 10-13 at issue here -- for a total of 164 months.

Francois's 140-month sentence on Counts 10-13 was thus central to the district court's calculation of Francois's overall sentencing package. As such, we conclude that correcting this error requires us to vacate his entire sentence and remand for complete re-sentencing. See <u>United States</u> v. <u>García-Ortiz</u>, 657

F.3d 25, 31 (1st Cir. 2011) ("When a defendant successfully challenges one of several interdependent sentences, the proper course often is to remand for resentencing on the other (non-vacated) counts."); <u>United States</u> v. <u>Pimienta-Redondo</u>, 874 F.2d 9, 14 (1st Cir. 1989) (en banc) ("[W]hen a defendant is found guilty on a multicount indictment . . . [, and] the conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand."); <u>see</u> <u>also</u> <u>United States</u> v. <u>Melvin</u>, 27 F.3d 710, 712 (1st Cir. 1994) (noting that the precedent in this Circuit establishes that "an appellate ruling invalidating a sentence, or reversing on some, but not all, counts of an indictment may implicate the trial judge's comprehensive, interdependent imposition of a penalty and thus require resentencing on all counts"). We make no judgment on the appropriate outcome of the re-sentencing.

## V. Conclusion

For the reasons explained above, we <u>affirm</u> Francois's conviction, but <u>vacate</u> his original sentence and <u>remand</u> to the district court for re-sentencing on all seventeen counts.

**<u>So ordered.</u>**