

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD85179 |
| | ) | |
| JOSEPH C. GRIEST, | ) | Opinion filed: May 2, 2023 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF
JACKSON COUNTY, MISSOURI
THE HONORABLE S. MARGENE BURNETT, JUDGE**

Division One: W. Douglas Thomson, Presiding Judge,
Lisa White Hardwick, Judge and Karen King Mitchell, Judge

Joseph C. Griest ("Griest") appeals his conviction for rape in the second degree following a jury trial in the Circuit Court of Jackson County ("trial court"). Griest raises three points on appeal, claiming the trial court erred in: (1) finding he withdrew his request to proceed to trial *pro se,* due to the trial court making improper statements following his assertion of his right to self-representation, (2) overruling his request to exclude State's Exhibit 15 ("Exhibit 15"), a photograph, from evidence where its late disclosure violated discovery rules and his rights to due process, a fair trial, and to present a defense, and (3) admitting Exhibit 15

because it was not logically or legally relevant, and its admission prejudiced him. We affirm.

## Factual and Procedural History[1]

On October 11, 2019, a grand jury indicted Griest with one count of rape in the first degree,[2] alleging "that on or about September 4, 2018, in the County of Jackson, State of Missouri, the defendant knowingly had sexual intercourse with [Victim][3] by the use of forcible compulsion." On July 15, 2021, Griest's counsel entered her appearance[4] and also filed a request for discovery under Rule 25.03.[5] She filed a similar, but more extensive, request on July 19, 2021. Included in both of these filings was the request that the State disclose any photographs related to the charged offense, with the July 19th filing also requesting disclosure of photographs the State intended to introduce into evidence. Additionally, on August 12, 2021, Griest, through counsel, requested a speedy trial.

The trial was initially set for November 15, 2021, with a pre-trial conference scheduled for November 5, 2021. During this pre-trial conference, Griest asserted the following:

---

[1] "'On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict.'" *State v. Williams*, 608 S.W.3d 205, 207 n.1 (Mo. App. W.D. 2020) (quoting *State v. Demark*, 581 S.W.3d 69, 73 n.2 (Mo. App. W.D. 2019)).

[2] A motion for leave to file an information in lieu of indictment charging Griest as a prior and persistent offender was later filed by the State and granted by the trial court.

[3] Pursuant to § 595.226, RSMo, we do not use the name of the victim in this opinion.

[4] Due to Griest being incarcerated on a separate federal offense, it was not until July 12, 2021 that he was served with a warrant and had his initial appearance in the present case.

[5] All rule references are to Missouri Supreme Court Rules (2021).

At this time, I am seriously considering going pro se, because I'm not satisfied with the level of representation from my attorney. I've asked her months ago – I begged her to get me a polygraph, to get me the toxicology report, and to get me the phone records. Months ago in July I begged for these, okay? I'm trying to prove my innocence. I'm trying to be cooperative. I just want to take a polygraph to prove that this didn't happen the way she said. She did not say no to me. She said, "Please, let me please you."

At this point, the trial court stopped Griest in order to prevent him from making "any more incriminating statements," acknowledged his concern, and advised him that he was still represented by his attorney.

The trial date was ultimately continued. The issue of Griest proceeding *pro se* came up again at a suppression hearing on November 22, 2021. At that time, the trial court was presented with Griest's handwritten "Motion for Pro Se." A discussion between the trial court and Griest took place, during which the trial court inquired into Griest's reasons for wanting to represent himself, informed Griest he would be required to follow the rules of evidence and criminal procedure, and questioned him about the charges he was facing, the range of punishment, and the jury trial process. Throughout this discussion, the trial court also commented regarding the consequences and dangers of Griest representing himself, including the following colloquy:

[THE COURT:] [The victim's] demeanor will be evaluated by 12 individuals selected from the community who may believe her. Who may very likely believe her. And do you understand that if you represent yourself, if you go through this without an attorney, *you will be convicted*, because you simply will not know how to present any type of a case for yourself in a courtroom?

MR. GRIEST: And if I don't represent myself, I can't get my lawyer to ask the questions that needs [sic] to be asked and –

3

THE COURT: No, your attorney needs to follow the rules of criminal procedure and follow Missouri law. She is not to file frivolous motions that a court would dismiss. She's not to ask for procedures such as a polygraph which a court may reject. Your attorney is governed by Missouri law.

Now, if you seriously want to go down this route, I can tell you right now you're not going to be ready go [sic] out on December 6th. You're going to end up staying in jail longer because you're not going to be able to meet and make the motions that are even in front of me today.

MR. GRIEST: *Fine. I will stay with her then.* (Indiscernible.) motions to dismiss.

THE COURT: I didn't hear what you said.

MR. GRIEST: I want to submit these Motions to Dismiss. *I'll go with her.* But I mean I'm entitled to a speedy trial. But I just want someone who is willing to fight for me, that's willing to – okay. I know she's got a law degree, I know she knows this stuff, but if she's not willing to make a phone call or not willing to at least tell me about a plea bargain offer that was, you know, submitted. I mean she has no commitment to me to do her job correctly. She lied to you all saying that she told me this, you know? I mean how – when the prosecutor said we revised our offer, she said, yeah, I told him about the first offer. She never did, you know?

THE COURT: I'm going to take you at your word that you are willing to stay with counsel. And counsel understands by everything you're saying today, it's going to take a while – it's going – the two of you have some mending to do of the relationship so that you can go on the sixth. But we are trying to get your case tried on December 6th. And if you're telling me you're willing to withdraw this motion at this time and proceed and let your attorney present the Motion to Suppress that she's filed today. I mean she's filed this and is trying to do this on your behalf. *So if you're willing to – I'm going to take you at your word. I'm going to ask you to confirm that you're willing to allow [counsel] to continue as your counsel today.*

MR. GRIEST: *Yes.*

(Emphasis added). The trial court also issued an order connected to this hearing, wherein it discussed the proceedings surrounding Griest's "Motion for Pro Se" and stated, "While Defendant could recite the charges against him and their

4

classifications, he struggled with basic trial concepts and shortly after the inquiry began, he decided to voluntarily withdrew [sic] his 'Motion for Pro Se.'"

The trial subsequently commenced on December 7, 2021 with jury selection.[6] Prior to opening statements the following day, the State informed the trial court it had been intending to contact one of its witnesses, Christa Leininger ("Leininger"), for months. Leininger was the nurse who conducted the forensic exam of Victim on September 4, 2018. The State explained it "got into contact with [Leininger] yesterday" and had learned through speaking with her that she had photographs of Victim taken at the time of the forensic exam. These were photographs the State did not have in its possession and was not aware Leininger possessed.

The State asserted it had contacted and forwarded the photographs to defense counsel the previous night, and was interested in presenting two of the photographs, State's Exhibit 14 and Exhibit 15, at trial. The former was a photograph of Victim, while the latter was a photograph of a red mark on Victim's back. Regarding the Exhibit 15 photograph, the State opined, "That back – the SANE nurse has listed that as a scratch. It really looks to me kind of like the mark that you may get when you take a nap too hard and your bedding is folded up underneath you." The State also explained,

> [Leininger] labeled it as a scratch. I told [defense counsel] that I understand that this is a late disclosure, and certainly if she's going to object to that I wouldn't fault her for that. However, because the SANE nurse is going to

---

[6] At trial, the parties stipulated Griest and Victim had sexual intercourse on the date and at the location of the rape.

testify that she documented a scratch, in my mind introducing the photo to show how very, very minimal this is would be less detrimental than not introducing the photo and having the jurors wonder what this scratch looked like.

Griest's counsel objected to the photographs as late disclosures, as well as to the "scratch" on relevance grounds. Regarding this relevance objection, counsel argued Victim had not indicated "there was any scratching," and stated the "scratch" "look[ed] like a very old, red mark, frankly." After the State informed the trial court the "scratch" had been noted in Leininger's disclosed report, the trial court found the following: "In that case, I do understand your concern. Since the information itself was relayed, I don't find any prejudice in introducing this. And quite frankly, I think it may minimize what someone would interpret as a scratch. So I'm going to go ahead and allow these two exhibits." Both exhibits were later admitted during the State's case over defense counsel's renewed objection on relevance and late disclosure grounds.

The jury found Griest guilty of the lesser-included offense of rape in the second degree. The trial court sentenced Griest to eight years in the Missouri Department of Corrections. Griest's subsequent Motion for Judgment of Acquittal or, in the Alternative, a New Trial was denied by the trial court, and he now appeals. Additional facts will be provided in the points below, as necessary.

Because Points II and III both concern Exhibit 15, we address them together, but we begin with Point I.

6

**Point I**

In his first point, Griest argues "[t]he trial court erred in finding that [he] withdrew his request to proceed to trial *pro se*[.]" Specifically, Griest claims the trial court "made improper statements following [his] valid assertion of his right to self-representation, in that [he] made a timely, unequivocal, knowing, and intelligent assertion of his right to self-representation; and the trial court continued to question and coerce [him] after the valid assertion had already been made."

Before addressing this claim of error, we must first consider whether it has been preserved for our review, and relatedly, what standard of review we are to apply. Griest asserts this claim has been preserved because he made a timely and unequivocal assertion of his right to proceed *pro se*. Consequently, he states the proper standard of review is *de novo*. Griest cites *State v. Black*, 223 S.W.3d 149 (Mo. banc 2007) for the proposition that a timely and unequivocal assertion of the right to self-representation preserves a claimed violation of that right for review. But *Black* involves the repeated *rejection* of an appellant's right to self-representation. 223 S.W.3d at 154. Indeed, the appellant in *Black* filed multiple motions clearly asserting his desire to represent himself and to not be appointed counsel, all of which were *overruled* by the trial court. *Id.* at 151-52. Similarly, in *State v. Johnson,* 328 S.W.3d 385 (Mo. App. E.D. 2010), the case Griest cites in claiming our review is *de novo*, the appellant had claimed error with the trial court's *denial* of "his request to discharge counsel and proceed *pro se*." *Id.* at 394.

7

Like *Black*, the trial court in *Johnson* had denied appellant's "numerous motions" to discharge his appointed lawyers and represent himself. *Id.* at 389-90.

The circumstances in *Black* and *Johnson* are importantly different from those we face here. In this case, the trial court never rejected or denied Griest's motion to proceed *pro se*; rather, as Griest admits, it only determined he withdrew such motion. Apparently recognizing this issue, Griest attempts to argue in his reply brief that *Black* should still apply here because "the trial court's improper comments at the *Faretta*[7] hearing induced any withdrawal of [his] request, effectively amounting to a denial." But Griest cites to no case law which applied *Black* or *Johnson* where a motion to proceed *pro se* was withdrawn by the defendant, and was never expressly ruled upon by the court.

Ultimately, however, we need not decide whether Griest properly preserved issues surrounding the trial court's treatment of his motion to proceed *pro se*, because whether the issues were preserved or not, Griest has failed to establish that the trial court's response to his motion was improper.

In particular, Griest first complains about various questions asked by the trial court during the November 22nd hearing pertaining to his "lack of technical legal knowledge." Griest points to the trial court asking him whether he had a law degree and how many cases he had tried in a courtroom, as well as to the following exchange:

---

[7] *Faretta v. California*, 422 U.S. 806 (1975).

> [THE COURT:]  Do you understand that if you're going to represent yourself, you have to follow all the rules of evidence and all the rules of criminal procedure?
>
> MR. GRIEST:  I will do my best, Your Honor.
>
> THE COURT:  Well, best is not good enough.

Griest next refers to two other comments made by the trial court at the conclusion of the hearing, the first being: "And do you understand that if you represent yourself, if you go through this without an attorney, *you will be convicted*, because you simply will not know how to present any type of a case for yourself in a courtroom?"  (Emphasis added).  The second comment went as follows:

> [THE COURT:]  Now, if you seriously want to go down this route, I can tell you right now you're not going to be ready go [sic] out on December 6th.  You're going to end up staying in jail longer because you're not going to be able to meet and make the motions that are even in front of me today.

Griest's assertion that these various statements "impermissibly interfered with his knowing and intelligent waiver of the right to counsel" is based on his arguments concerning what is relevant and permissible for a trial court to consider in *determining* whether a defendant is making such a waiver.  But we fail to see how Griest can make these arguments when the trial court made no such determination.[8]  In fact, it was *unable* to make this determination because Griest ultimately withdrew his request.

---

[8] *Cf. State v. Lee*, 637 S.W.3d 446, 459 (Mo. App. W.D. 2021) (discussing the finding in *Jones v. Norman*, 633 F.3d 661 (8th Cir. 2011) "that the trial court relied on improper grounds in *denying* Jones' request to represent himself" and quoting the Eighth Circuit's reasoning: "***The court may not, however, independently consider whether the court believes the defendant will be successful in the face of those expectations when the court is determining whether the defendant's waiver is knowing and voluntary***." (first emphasis added) (quoting *Jones*, 633 F.3d

We also disagree that any of these comments "induced" Griest to withdraw his request, seeing how the trial court was explaining the dangers of self-representation, as it is required to do. *See Black*, 223 S.W.3d at 156 ("[T]he court should advise him generally that it is usually a mistake to proceed without a lawyer and then specifically warn him about the dangers and repercussions of that decision"). Importantly, "[a] trial court can only make certain that a defendant has knowingly, voluntarily, and intelligently waived the right to counsel from a *penetrating* and comprehensive examination of all the circumstances." *State v. Floyd*, 635 S.W.3d 593, 598 (Mo. App. W.D. 2021) (emphasis added) (quoting *State v. Kunonga*, 490 S.W.3d 746, 763-64 (Mo. App. W.D. 2016)). Indeed, ""[t]he probability that a defendant will appeal either decision of the trial judge [granting or denying a motion to proceed *pro se*] underscores the importance of requiring a defendant who wishes to waive his right to counsel to do so explicitly and unequivocally."" *Kunonga*, 490 S.W.3d at 763 (quoting *Black,* 223 S.W.3d at 153).

Griest does not challenge the accuracy of the trial court's statement that, if he chose to proceed *pro se*, he would not be ready to proceed to trial on December 6, and that a further continuance of the trial date would accordingly be necessary. That statement immediately preceded Griest's withdrawal of his request for self-

at 667-68)); *Faretta*, 422 U.S. at 836 (in finding "the California courts deprived [Faretta] of his constitutional right to conduct his own defense" when *it forced him "to accept against his will a state-appointed public defender,"* the Supreme Court stated, "For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." (emphasis added)).

10

representation. Because Griest does not challenge the accuracy of the court's statement that a continuance would be necessary if he dismissed his appointed counsel, that statement cannot be considered improperly coercive, particularly where the Supreme Court has held that, "before a defendant may be allowed to proceed *pro se*, he must be warned specifically of the hazards ahead." *Iowa v. Tovar*, 541 U.S. 77, 88-89 (2004).

Griest also attacks the trial court's statement that "if you represent yourself, if you go through this without an attorney, *you will be convicted*." Standing alone, this statement is problematic and not advisable, since it states that Griest's conviction was *inevitable* unless he was represented by counsel. But this statement must be viewed in context. Viewed in that light, the statement can only be understood as the court's *prediction* of the likely outcome if Griest proceeded *pro se*. First, the statement is preceded by the court's statement that "[the victim's] demeanor will be evaluated by 12 individuals selected from the community who *may* believe her. Who may *very likely* believe her." (Emphasis added). These statements make clear that the trial court was merely offering its *predictions* as to the conclusion the jury would reach. Notably, the case was being tried to a jury, not to the court. Moreover, immediately after expressing its forecast that "you will be convicted," the court explained *why* it considered Griest's conviction to be likely: that "you simply will not know how to present any type of a case for yourself in a courtroom."

11

It is entirely proper for a trial court to give a defendant the court's frank assessment of the defendant's likelihood of success if the defendant chooses to proceed *pro se*. In order for a defendant to be able to meaningfully assess "the risk of proceeding to trial *pro se*," the defendant must have information concerning "the probability that a defendant will be convicted" if they proceed without counsel. *Arrendondo v. Neven*, 763 F.3d 1122, 1131 (9th Cir. 2014) (emphasis added). The Supreme Court has itself noted, as a matter of accepted fact, that "the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant[.]" *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). In *Faretta* itself, the Court noted with approval that "[t]he trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel[.]" 422 U.S. at 835-36. Similarly, in *State v. Leonard*, 490 S.W.3d 730 (Mo. App. W.D. 2016), we held that a defendant had knowingly and intelligently waived his right to counsel after the trial court went "so far as to suggest that 'this is[,] of probably all the mistakes that you've made in your life, this might be number one.'" *Id.* at 735, 739-42 (alteration in original). And in *United States v. Francois*, 715 F.3d 21 (1st Cir. 2013), the First Circuit suggested that a district court *had not gone far enough* in warning a defendant "that self-representation would be a 'terrible idea' and a 'catastrophic mistake[.]'" *Id.* at 30. The appellate court faulted the district court for "not go[ing] beyond these dire generalizations to give a specific example of the consequences of self-representation . . . ." *Id.*

12

In this case, the trial court's expression of its belief that Griest was very likely to be convicted if he proceeded to trial without a lawyer was not unduly coercive, but instead provided him with important information to guide his decision whether or not to proceed *pro se*.

Here, during the required, comprehensive and penetrating examination of the trial court, Griest chose to withdraw his motion to proceed *pro se*.  Critically, it was Griest who made the decision to withdraw his request, not the trial court, and it is clear from the record he voluntarily chose to do so.[9]  We therefore find Griest has failed to demonstrate that reversible error occurred.

Point I is denied.

## Points II and III

Points II and III both claim the trial court erred and abused its discretion in making certain rulings regarding Exhibit 15.  In Point II, Griest focuses on the trial court overruling his request to exclude Exhibit 15 from evidence, arguing its late disclosure and asserting it was "the only piece of physical evidence corroborating the complaining witness' claims; a continuance would not have been an

---

[9] Indeed, the record reflects multiple reasons other than the complained-of comments by the trial court that could have ultimately led to Griest's voluntarily withdrawal.  For example, he was informed that the crime he had been charged with was "an 85 percent crime[,]" meaning he would be required to serve at least 85% of the sentence imposed.  Additionally, he was reminded that inadvertent admissions while representing himself would be used against him, as well as that he would be "up against a seasoned attorney[.]"  These consequences alone are enough to impress upon a defendant the seriousness and weight of his decision.

appropriate remedy; and [he] had no time to formulate a meaningful response to the crucial evidence."

In Point III, Griest pinpoints the trial court's admission of Exhibit 15 over his objection, claiming "the evidence was neither logically nor legally relevant and its admission prejudiced [him] because it was the only independent evidence corroborating the testimony of the complaining witness that the sexual encounter between herself and . . . Griest was not consensual." We will examine each point in turn, beginning with Point II.

## A. **Standard of Review**

In addressing Point II, we apply the following:

> "In reviewing criminal discovery claims, this Court will overturn the trial court only if it appears that the trial court abused its discretion." *State v. Taylor*, 944 S.W.2d 925, 932 (Mo. banc 1997). Even where there is a discovery violation, "[a] trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant." *State v. Taylor*, 298 S.W.3d 482, 502 (Mo. banc 2009)[.]

*State v. Zuroweste*, 570 S.W.3d 51, 56 (Mo. banc 2019) (first alteration in original) (other citations omitted).

And, with respect to Point III,

> "The standard of review for the admission of evidence is abuse of discretion." "A trial court has broad discretion to admit or exclude evidence at trial." "The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect." "Abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." Only if the error is so prejudicial that it deprived the defendant of a fair trial is reversal warranted. Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial.

14

*State v. Williams*, 420 S.W.3d 713, 721 (Mo. App. W.D. 2014) (internal citations omitted) (quoting and citing *State v. Peal*, 393 S.W.3d 621, 625 (Mo. App. W.D. 2013)).

### B. Analysis

In addressing Griest's second point on appeal, we begin with his claim that the late disclosure of Exhibit 15 violated Rule 25.03 and his rights to due process, a fair trial, and to present a defense. More specifically, he claims that "[b]ecause the State failed to make a reasonable inquiry by contacting Leininger prior to the eve of trial, the last-minute disclosure of Exhibit 15 constituted a Rule 25.03 violation."

"The purpose of discovery is to provide the defendant with an appropriate opportunity to avoid surprise and to prepare for trial in advance." *State v. Rippee*, 118 S.W.3d 682, 684 (Mo. App. S.D. 2003) (citation omitted). Rule 25.03(b) requires that "the state shall, upon written request of defendant's counsel, disclose to defendant's counsel the following material and information within its possession *or control* designated in the request[.]" (Emphasis added). Such "material and information" includes "photographs . . . that relate to the offense for which defendant is charged" and "photographs . . . the state intends to introduce into evidence at the hearing or trial . . . ." Rule 25.03(b)(1),(7). Importantly, "[t]his duty to disclose includes not only information that is actually known to the prosecutor, *but also information that may be learned through reasonable inquiry.*" *Rippee*, 118 S.W.3d at 684 (emphasis added) (citation omitted).

15

Here, the State argues that "[b]ecause [it] was unaware of the photos and they were not in the possession or control of the government, no duty to disclose could arise before the State gained actual knowledge and possession of them." However, this argument conveniently overlooks that the duty to disclose includes "information that may be learned through reasonable inquiry." *Id.* (citation omitted). The State admitted to the trial court it had been "intending" to contact Leininger "for months" and had "only very recently got into contact with her yesterday." Notably, Leininger was the nurse who conducted the forensic exam of Victim, a critical witness to the State. It is evident that a reasonable inquiry by the State would have prevented any potential discovery violation in that the State learned of Exhibit 15 *as soon as it contacted* Leininger.[10] Consequently, we find the State did not comply with Rule 25.03.[11]

Despite this discovery violation, Griest's claim ultimately fails because no fundamental unfairness resulted. "'Fundamental unfairness occurs when the state's failure to disclose results in defendant's "genuine surprise" and the surprise

---

[10] We acknowledge the State did disclose Leininger as a State witness in its September 2021 formal response to Griest's discovery request and that the State disclosed the photos as soon as they were in the State's possession. However, neither of these facts excuse the delay in disclosing the photos until the evening following the first day of trial in December.

[11] *Compare with State v. Varner*, 837 S.W.2d 44, 45-46 (Mo. App. E.D. 1992) (holding "the trial court erred in finding no violation by the prosecutor of discovery procedures" when the prosecution informed the defense the morning of trial it intended to introduce evidence of the defendant's statement. In so holding, the Eastern District stated, "Reasonable inquiry by the prosecuting attorney would have certainly uncovered the report which would then be discoverable by defendant. The prosecutor had a duty of reasonable inquiry and a duty to produce the defendant's 'statement.' The contested ruling ignores the duty of reasonable inquiry which goes beyond what may be in an attorney's file").

16

prevents meaningful efforts to consider and prepare a strategy for addressing the evidence.'" *Zuroweste*, 570 S.W.3d at 60 (quoting *State v. Tisius*, 92 S.W.3d 751, 762 (Mo. banc 2002)).  Here, the lack of fundamental unfairness is demonstrated by Griest's inability to demonstrate "exactly what [he] would have done differently had the State timely disclosed [Exhibit 15]."  *Id.* at 62.  In particular, Griest is required to "establish the late disclosure 'bore a real potential for substantively altering the outcome of the trial.'"  *Id.* (quoting *State v. Johnston*, 957 S.W.2d 734, 750 (Mo. banc 1997)).  While Griest claims his defense to Exhibit 15 "would have most likely been" medical expert testimony refuting Leininger's claim that the mark was a scratch, he does not demonstrate how such testimony could have resulted in a different outcome at trial.  *See id.*  Nor could he, as an examination of the record reveals.

Specifically, Leininger's documentation of a "scratch" had already been disclosed in her report, leaving Griest unable to argue he was ignorant or unprepared for such evidence.  Additionally, defense counsel was able to substantially discount Leininger's testimony entirely *using* Exhibit 15 during closing arguments, to wit:

> I also want you guys to pay close attention to the photo of [Victim]'s back.  The nurse testified yesterday that she had multiple lacerations on her back. I'm going to show you again, State's Exhibit 15.  Very, very hard to see.  When you go back to the jury room, take this back there, look at it.  It does not look like a scratch.  Honestly, it kinda looks like maybe she had laid somewhere too long and had a crease from the sheets or something.  It does not look like a scratch.  Further, I would argue that that's not even multiple scratches if it is a scratch.  But I'm not a trained nurse, right?  I don't know what a laceration is other than my limited experience.  But what I do know

17

is what I see, and that does not look like a scratch. Further, when [Victim] testified, she never at any point in any of her statements said that her back was scratched. She never alleged [Griest] held her against anything or said that she had any injuries. Guys, there was no force, no threat, and no resistance.

Significantly, this is all in *addition* to the State downplaying Exhibit 15 and the "scratch" during trial. For example, the State elicited from Leininger that the "injuries" on Victim's back "were not the worst injuries [she's] ever seen[.]" Moreover, the State followed up on its pre-trial statement to the trial court and defense counsel that "because the SANE nurse is going to testify that she documented a scratch, in my mind introducing [Exhibit 15] to show how very, very minimal this is would be less detrimental than not introducing the photo," when in closing the State admitted that, "[m]aybe it's a scratch on her back, maybe it's not." Indeed, during the pre-trial conference, the State voiced a desire to admit the photograph because "[i]t really looks to me kind of like the mark that you may get when you take a nap too hard and your bedding is folded up underneath you," and thus minimizes Leininger's testimony in that regard. The trial court expressed an understanding of the State's concern in this respect, and, in admitting Exhibit 15, stated, "I think it may minimize what someone would interpret as a scratch. So I'm going to go ahead and allow [Exhibits 14 and 15]."

What is evident from the record is that Griest was able to effectively counteract, impeach, and even rebut Leininger's testimony, *using* Exhibit 15. It is thus unclear how he can argue medical expert testimony would have changed his defense strategy or had "'real potential for substantively altering the outcome of

18

the trial.'" *Zuroweste*, 570 S.W.3d at 62 (quoting *Johnston*, 957 S.W.2d at 750). This is especially true considering how the trial court and the State, *both non-experts*, recognized the mark depicted in Exhibit 15 as minimal.[12]  In total, the record demonstrates Exhibit 15 was actually beneficial to Griest.  Accordingly, he has not shown any fundamental unfairness, or even prejudice, resulted from the State's late disclosure of Exhibit 15.

Notably, the only trial court action Griest complains of is its failure to exclude Exhibit 15, and he acknowledges that the typical remedy for late disclosure of evidence is to request a continuance.  However, "a defendant's '[f]ailure to seek a continuance leads to the inference that the late endorsement was not damaging to the complaining party.'"  *Id.* at 61 (alteration in original) (quoting *State v. Hutchison*, 957 S.W.2d 757, 764 (Mo. banc 1997)).[13]  Griest attempts to escape such

---

[12] Indeed, the State's admission during closing that "[m]aybe it's a scratch on her back, maybe it's not[,]" could have arguably played a role in the jury finding Griest guilty of the lesser-included offense of rape in the *second* degree rather than rape in the *first* degree.

[13]  The Missouri Supreme Court discussed remedies for late disclosures in *Zuroweste*, and noted that "the exclusion of evidence is 'a drastic remedy that should be used with the utmost of caution.'"  *Zuroweste*, 570 S.W.3d at 60 (quoting *State v. Mansfield*, 637 S.W.2d 699, 703 (Mo. banc 1982) (overruled on other grounds)).  The defendant in *Zuroweste*, like Griest in this case, sought to exclude late disclosed evidence as the only remedy to the late disclosure and did not request a continuance. *Id.* at 55.  The Court noted, "before the drastic sanction of exclusion is imposed, circuit courts must consider employing less severe remedies to address the prejudice resulting from the discovery violation and achieve fundamental fairness for all parties." *Id.* at 60.  The Court also held that it is appropriate for the appellate court to consider a defendant's failure to request a continuance in determining whether the trial court abused its discretion. *Id.* at 61.  The Court ultimately concluded that the trial court did not abuse its discretion in overruling the defendant's motion to exclude the late disclosed evidence because the defendant did "not show[] the drastic remedy of exclusion was justified over a simple continuance[.]" *Id.* at 61-62.

19

an inference by arguing "[a] continuance was not the appropriate remedy because it would have forced him to give up his right to a speedy trial." As support for this position, Griest asserts "the length of a continuance here was made clear on the record; it would have delayed [his] trial almost three additional months." Griest makes this assertion based on discussions during trial between counsel and the trial court about a potential continuance date in late February for a wholly different reason: two ill witnesses.

In this regard we agree with the State, that these discussions dealt with a completely separate issue and provided no certainty as to what a continuance for a discovery violation would have looked like. Indeed, "[t]he record does not include any indication as to whether delaying the proceedings *to review late discovery* would have resulted in a substantial delay." *State v. Clark*, 486 S.W.3d 479, 488 (Mo. App. W.D. 2016) (emphasis added). Griest is merely *assuming* the three-month delay due to two ill witnesses would apply to a continuance for a discovery violation. Griest never suggested a continuance or even inquired into the length of such a continuance; "[i]n effect, [Griest]'s attorney made no inquiry as to whether [Griest]'s Sixth Amendment rights would be affected." *Id*. at 489. We therefore disagree with Griest that there was any "actual tension" between his right to a

---

Considering that part of Griest's argument claims he was prevented "from formulating a defense to the evidence[,]" it seems appropriate to seek a continuance. However, the record reveals Griest never requested a continuance or even inquired into that possibility. This is detrimental to his claim and gives rise to the inference articulated in *Zuroweste*. As we explain below, like in *Zuroweste*, Griest has not demonstrated that exclusion of the evidence was "justified over a simple continuance." *Id*. at 61.

speedy trial and his right to due process in discovery to require the exclusion of Exhibit 15. As such, Griest has also not established prejudice from any type of delay to justify arguing for the exclusion of Exhibit 15 rather than a continuance. The trial court did not abuse its discretion in overruling Griest's request to exclude Exhibit 15 from evidence. Point II is denied.

For similar reasons identified in response to Point II, *supra*, we dispense with Griest's third point on appeal. In Point III, Griest claims the admission of Exhibit 15 was error because it "was neither logically nor legally relevant and its admission prejudiced [him] because it was the only independent evidence corroborating the testimony of the complaining witness that the sexual encounter between herself and . . . Griest was not consensual." We disagree. Regardless of whether or not the admission of Exhibit 15 was error, Griest's argument is defeated by the lack of prejudice. Indeed, "[o]nly if the error is so prejudicial that it deprived the defendant of a fair trial is reversal warranted. Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial." *Williams*, 420 S.W.3d at 721 (citations omitted).

As discussed in Point II, no prejudice resulted here. This is due to Exhibit 15 minimizing, even negating, Leininger's testimony regarding the "scratch."[14] This is evident in examining defense counsel's closing argument, as well as in the

---

[14] Griest essentially demonstrates this useful purpose of Exhibit 15 when he argues Leininger "simply referred to the mark as a 'laceration' uncovered during her sexual assault examination of [Victim], and *no further evidence was offered regarding its severity or origin.*" (Emphasis added).

State's rebuttal argument where it questioned the "scratch" and went so far as to emphasize that injury does not need to be present for a finding of rape. Accordingly, we find the admission of Exhibit 15 did not deprive Griest of a fair trial nor give rise to a reasonable probability that it affected the outcome of the trial. On the contrary, its admission *benefitted* Griest. The trial court did not abuse its discretion in admitting Exhibit 15 over Griest's objection. Point III is denied.

## Conclusion

For the foregoing reasons, Griest's conviction is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.